*748 Justice Alito
announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II-A, II-B, II-D, and III, in which The Chief Justice, Jus *749 tice Scalia, Justice Kennedy, and. Justice Thomas join, and an opinion with respect to Parts II-C, IV, and V, in which The Chief Justice, Justice Scalia, and Justice Kennedy join.
Two years ago, in District of Columbia v. Heller, 554 U. S. 570 (2008), we held that the Second Amendment protects the *750 right to keep and bear arms for the purpose of self-defense, and we struck down a District of Columbia law that banned the possession of handguns in the home. The city of Chicago (Chicago or City) and the village of Oak Park, a Chicago suburb, have laws that are similar to the District of Columbia’s, but Chicago and Oak Park argue that their laws are constitutional because the Second Amendment has no application to the States. We have previously held that most of the provisions of the Bill of Rights apply with full force to both the Federal Government and the States. Applying the standard that is well established in our case law, we hold that the Second Amendment right is fully applicable to the States.
I
Otis McDonald, Adam Orlov, Colleen Lawson, and David Lawson (Chicago petitioners) are Chicago residents who would like to keep handguns in their homes for self-defense but are prohibited from doing so by Chicago’s firearms laws. A City ordinance provides that “[n]o person shall... possess . . . any firearm unless such person is the holder of a valid registration certificate for such firearm.” Chicago, Ill., Municipal Code § 8-20-040(a) (2009). The Code then prohibits registration of most handguns, thus effectively banning handgun possession by almost all private citizens who reside in the City. § 8-20-050(c). Like Chicago, Oak Park makes it “unlawful for any person to possess . . . any firearm,” a term that includes “pistols, revolvers, guns and small arms . . . commonly known as handguns.” Oak Park, 111., Village Code §§27-2-1 (2007), 27-1-1 (2009).
Chicago enacted its handgun ban to protect its residents “from the loss of property and injury or death from fire *751 arms.” See Chicago, Ill., Journal of Proceedings of the City Council, p. 10049 (Mar. 19, 1982). The Chicago petitioners and their amici, however, argue that the handgun ban has left them vulnerable to criminals. Chicago Police Department statistics, we are told, reveal that the City’s handgun murder rate has actually increased since the ban was enacted [1] and that Chicago residents now face one of the highest murder rates in the country and rates of other violent crimes that exceed the average in comparable cities.[2]
Several of the Chicago petitioners have been the targets of threats and violence. For instance, Otis McDonald, who is in his late seventies, lives in a high-crime neighborhood. He is a community activist involved with alternative policing strategies, and his efforts to improve his neighborhood have subjected him to violent threats from drug dealers. App. 16-17; Brief for State Firearm Associations as Amici Curiae 20-21; Brief for State of Texas et al. as Amici Curiae 7-8. Colleen Lawson is a Chicago resident whose home has been targeted by burglars. “In Mrs. Lawson’s judgment, possessing a handgun in Chicago would decrease her chances of suffering serious injury or death should she ever be threatened again in her home.”[3] McDonald, Lawson, and the other Chicago petitioners own handguns that they store outside of the city limits, but they would like to keep their handguns in their homes for protection. See App. 16-19, 43-44 (McDonald), 20-24 (C. Lawson), 19, 36 (Orlov), 20-21, 40 (D. Lawson).
*752 After our decision in Heller, the Chicago petitioners and two groups[4] filed suit against the City in the United States District Court for the Northern District of Illinois. They sought a declaration that the handgun ban and several related Chicago ordinances violate the Second and Fourteenth Amendments to the United States Constitution. Another action challenging the Oak Park law was filed in the same District Court by the National Rifle Association (NRA) and two Oak Park residents. In addition, the NRA and others filed a third action challenging the Chicago ordinances. All three cases were assigned to the same District Judge.
The District Court rejected plaintiffs’ argument that the Chicago and Oak Park laws are unconstitutional. See App. 83-84; NRA, Inc. v. Oak Park, 617 F. Supp. 2d 752, 754 (ND Ill. 2008). The court noted that the Seventh Circuit had “squarely upheld the constitutionality of a ban on handguns a quarter century ago,” id., at 753 (citing Quilici v. Morton Grove, 695 F. 2d 261 (CA7 1982)), and that Heller had explicitly refrained from “opin[ing] on the subject of incorporation vel non of the Second Amendment,” NRA, 617 F. Supp. 2d, at 754. The court observed that a district judge has a “duty to follow established precedent in the Court of Appeals to which he or she is beholden, even though the logic of more recent caselaw may point in a different direction.” Id., at 753.
The Seventh Circuit affirmed, relying on three 19th-century cases — United States v. Cruikshank, 92 U. S. 542 (1876), Presser v. Illinois, 116 U. S. 252 (1886), and Miller v. Texas, 153 U. S. 535 (1894) — that were decided in the wake of this Court’s interpretation of the Privileges or Immunities Clause of the Fourteenth Amendment in the Slaughter-House Cases, 16 Wall. 36 (1873). The Seventh Circuit described the rationale of those cases as “defunct” and recognized that they did not consider the question whether the *753 Fourteenth Amendment’s Due Process Clause incorporates the Second Amendment right to keep and bear arms. NRA, Inc. v. Chicago, 567 F. 3d 856, 857, 858 (2009). Nevertheless, the Seventh Circuit observed that it was obligated to follow Supreme Court precedents that have “direct application,” and it declined to predict how the Second Amendment would fare under this Court’s modern “selective incorporation” approach. Id., at 857-858 (internal quotation marks omitted).
We granted, certiorari. 557 U. S. 965 (2009).
II
A
Petitioners argue that the Chicago and Oak Park laws violate the right to keep and bear arms for two reasons. Petitioners’ primary submission is that this right is among the “privileges or immunities of citizens of the United States” and that the narrow interpretation of the Privileges or Immunities Clause adopted in the Slaughter-House Cases, supra, should now be rejected. As a secondary argument, petitioners contend that the Fourteenth Amendment’s Due Process Clause “incorporates” the Second Amendment right.
Chicago and Oak Park (municipal respondents) maintain that a right set out in the Bill of Rights applies to the States only if that right is an indispensable attribute of any “ ‘civilized’ ” legal system. Brief for Municipal Respondents 9. If it is possible to imagine a civilized country that does not recognize the right, the municipal respondents tell us, then that right is not protected by due process. Ibid. And since there are civilized countries that ban or strictly regulate the private possession of handguns, the municipal respondents maintain that due process does not preclude such measures. Id., at 21-23. In light of the parties’ far-reaching arguments, we begin by recounting this Court’s analysis over the years of the relationship between the provisions of the Bill of Rights and the States.
*754 B
The Bill of Rights, including the Second Amendment, originally applied only to the Federal Government. In Barron ex rel. Tiernan v. Mayor of Baltimore, 7 Pet. 243 (1833), the Court, in an opinion by Chief Justice Marshall, explained that this question was “of great importance” but “not of much difficulty.” Id., at 247. In less than four pages, the Court firmly rejected the proposition that the first eight Amendments operate as limitations on the States, holding that they apply only to the Federal Government. See also Lessee of Livingston v. Moore, 7 Pet. 469, 551-552 (1833) (“[I]t is now settled that those amendments [in the Bill of Rights] do not extend to the states”).
The constitutional Amendments adopted in the aftermath of the Civil War fundamentally altered our country’s federal system. The provision at issue in this case, § 1 of the Fourteenth Amendment, provides, among other things, that a State may not abridge “the privileges or immunities of citizens of the United States” or deprive “any person of life, liberty, or property, without due process of law.”
Four years after the adoption of the Fourteenth Amendment, this Court was asked to interpret the Amendment’s reference to “the privileges or immunities of citizens of the United States.” The Slaughter-House Cases, supra, involved challenges to a Louisiana law permitting the creation of a state-sanctioned monopoly on the butchering of animals within the city of New Orleans. Justice Samuel Miller’s opinion for the Court concluded that the Privileges or Immunities Clause protects only those rights “which owe their existence to the Federal government, its National character, its Constitution, or its laws.” Id., at 79. The Court held that other fundamental rights — rights that predated the creation of the Federal Government and that “the State governments were created to establish and secure” — were not protected by the Clause. Id., at 76.
*755 In drawing a sharp distinction between the rights of federal and state citizenship, the Court relied on two principal arguments. First, the Court emphasized that the Fourteenth Amendment’s Privileges or Immunities Clause spoke of “the privileges or immunities of citizens of the United States,” and the Court contrasted this phrasing with the wording in the first sentence of the Fourteenth Amendment and in the Privileges and Immunities Clause of Article IV, both of which refer to state citizenship.[5] (Emphasis added.) Second, the Court stated that a contrary reading would “radically ehang[e] the whole theory of the relations of the State and Federal governments to each other and of both these governments to the people,” and the Court refused to conclude that such a change had been made “in the absence of language which expresses such a purpose too clearly to admit of doubt.” Id., at 78. Finding the phrase “privileges or immunities of citizens of the United States” lacking by this high standard, the Court reasoned that the phrase must mean something more limited.
Under the Court’s narrow reading, the Privileges or Immunities Clause protects such things as the right
“to come to the seat of government to assert any claim [a citizen] may have upon that government, to transact any business he may have with it, to seek its protection, to share its offices, to engage in administering its functions . . . [and to] become a citizen of any State of the Union by a bona fide residence therein, with the same rights as other citizens of that State.” Id., at 79-80 (internal quotation marks omitted).
*756 Finding no constitutional protection against state intrusion of the kind envisioned by the Louisiana statute, the Court upheld the statute. Four Justices dissented. Justice Field, joined by Chief Justice Chase and Justices Swayne and Bradley, criticized the majority for reducing the Fourteenth Amendment’s Privileges or Immunities Clause to “a vain and idle enactment, which accomplished nothing, and most unnecessarily excited Congress and the people on its passage.” Id., at 96; see also id., at 104. Justice Field opined that the Privileges or Immunities Clause protects rights that are “in their nature . . . fundamental,” including the right of every man to pursue his profession without the imposition of unequal or discriminatory restrictions. Id., at 96-97 (internal quotation marks omitted). Justice Bradley’s dissent observed that “we are not bound to resort to implication ... to find an authoritative declaration of some of the most important privileges and immunities of citizens of the United States. It is in the Constitution itself.” Id., at 118. Justice Bradley would have construed the Privileges or Immunities Clause to include those rights enumerated in the Constitution as well as some unenumerated rights. Id., at 119. Justice Swayne described the majority’s narrow reading of the Privileges or Immunities Clause as “turn[ing] . . . what was meant for bread into a stone.” Id., at 129 (dissenting opinion).
Today, many legal scholars dispute the correctness of the narrow Slaughter-House interpretation. See, e. g., Saenz v. Roe, 526 U. S. 489, 522, n. 1, 527 (1999) (Thomas, J., dissenting) (scholars of the Fourteenth Amendment agree “that the Clause does not mean what the Court said it meant in 1873”); Amar, Substance and Method in the Year 2000, 28 Pepper-dine L. Rev. 601, 631, n. 178 (2001) (“Virtually no serious modern scholar — left, right, and center — thinks that this [interpretation] is a plausible reading of the Amendment”); Brief for Constitutional Law Professors as Amici Curiae 33 (claiming an “overwhelming consensus among leading consti *757 tutional scholars” that the opinion is “egregiously wrong”); C. Black, A New Birth of Freedom 74-75 (1997).
Three years after the decision in the Slaughter-House Cases, the Court decided Cruikshank, the first of the three 19th-century cases on which the Seventh Circuit relied. 92 U. S. 542. In that case, the Court reviewed convictions stemming from the infamous Colfax Massacre in Louisiana on Easter Sunday 1873. Dozens of blacks, many unarmed, were slaughtered by a rival band of armed white men.[6] Cruikshank himself allegedly marched unarmed African-American prisoners through the streets and then had them summarily executed.[7] Ninety-seven men were indicted for participating in the massacre, but only nine went to trial. Six of the nine were acquitted of all charges; the remaining three were acquitted of murder but convicted under the Enforcement Act of 1870,16 Stat. 140, for banding and conspiring together to deprive their victims of various constitutional rights, including the right to bear arms.[8]
The Court reversed all of the convictions, including those relating to the deprivation of the victims’ right to bear arms. Cruikshank, 92 U. S., at 553, 559. The Court wrote that the right of bearing arms for a lawful purpose “is not a right granted by the Constitution” and is not “in any manner dependent upon that instrument for its existence.” Id., at 553. “The second amendment,” the Court continued, “declares that it shall not be infringed; but this . . . means no more than that it shall not be infringed by Congress.” Ibid. “Our later decisions in Presser v. Illinois, 116 U. S. 252, 265 *758 (1886), and Miller v. Texas, 153 U. S. 535, 538 (1894), reaffirmed that the Second Amendment applies only to the Federal Government.” Heller, 554 U. S., at 620, n. 23.
C
As previously noted, the Seventh Circuit concluded that Cruikshank, Presser, and Miller doomed petitioners’ claims at the Court of Appeals level. Petitioners argue, however, that we should overrule those decisions and hold that the right to keep and bear arms is one of the “privileges or immunities of citizens of the United States.” In petitioners’ view, the Privileges or Immunities Clause protects all of the rights set out in the Bill of Rights, as well as some others, see Brief for Petitioners 10, 14, 15-21, but petitioners are unable to identify the Clause’s full scope, Tr. of Oral Arg. 5-6, 8-11. Nor is there any consensus on that question among the scholars who agree that the Slaughter-House Cases’ interpretation is flawed. See Saenz, supra, at 522, n. 1 (Thomas, J., dissenting).
We see no need to reconsider that interpretation here. For many decades, the question of the rights protected by the Fourteenth Amendment against state infringement has been analyzed under the Due Process Clause of that Amendment and not under the Privileges or Immunities Clause. We therefore decline to disturb the Slaughter-House holding.
At the same time, however, this Court’s decisions in Cruikshank, Presser, and Miller do not preclude us from considering whether the Due Process Clause of the Fourteenth Amendment makes the Second Amendment right binding on the States. See Heller, 554 U. S., at 620, n. 23. None of those cases “engage[d] in the sort of Fourteenth Amendment inquiry required by our later cases.” Ibid. As explained more fully below, Cruikshank, Presser, and Miller all preceded the era in which the Court began the process of “selective incorporation” under the Due Process Clause, and we have never previously addressed the question whether the *759 right to keep and bear arms applies to the States under that theory.
Indeed, Cruikshank has not prevented us from holding that other rights that were at issue in that case are binding on the States through the Due Process Clause. In Cruikshank, the Court held that the general “right of the people peaceably to assemble for lawful purposes,” which is protected by the First Amendment, applied only against the Federal Government and not against the States. See 92 U. S., at 551-552. Nonetheless, over 60 years later the Court held that the right of peaceful assembly was a “fundamental righ[t] . . . safeguarded by the due process clause of the Fourteenth Amendment.” De Jonge v. Oregon, 299 U. S. 353, 364 (1937). We follow the same path here and thus consider whether the right to keep and bear arms applies to the States under the Due Process Clause.
D
1
In the late 19th century, the Court began to consider whether the Due Process Clause prohibits the States from infringing rights set out in the Bill of Rights. See Hurtado v. California, 110 U. S. 516 (1884) (due process does not require grand jury indictment); Chicago, B. & Q. R. Co. v. Chicago, 166 U. S. 226 (1897) (due process prohibits States from taking of private property for public use without just compensation). Five features of the approach taken during the ensuing era should be noted.
First, the Court viewed the due process question as entirely separate from the question whether a right was a privilege or immunity of national citizenship. See Twining v. New Jersey, 211 U. S. 78, 99 (1908).
Second, the Court explained that the only rights protected against state infringement by the Due Process Clause were those rights “of such a nature that they are included in the conception of due process of law.” Ibid. See also, e. g., Ad *760 amson v. California, 332 U. S. 46 (1947); Belts v. Brady, 316 U. S. 455 (1942); Palko v. Connecticut, 302 U. S. 319 (1937); Grosjean v. American Press Co., 297 U. S. 233 (1936); Powell v. Alabama, 287 U. S. 45 (1932). While it was “possible that some of the personal rights safeguarded by the first eight Amendments against National action [might] also be safeguarded against state action,” the Court stated, this was “not because those rights are enumerated in the first eight Amendments.” Twining, 211 U. S., at 99.
The Court used different formulations in describing the boundaries of due process. For example, in Twining, the Court referred to “immutable principles of justice which inhere in the very idea of free government which no member of the Union may disregard.” Id., at 102 (internal quotation marks omitted). In Snyder v. Massachusetts, 291 U. S. 97, 105 (1934), the Court spoke of rights that are “so rooted in the traditions and conscience of our people as to be ranked as fundamental.” And in Palko, the Court famously said that due process protects those rights that are “the very essence of a scheme of ordered liberty” and essential to “a fair and enlightened system of justice.” 302 U. S., at 325.
Third, in some cases decided during this era the Court “can be seen as having asked, when inquiring into whether some particular procedural safeguard was required of a State, if a civilized system could be imagined that would not accord the particular protection.” Duncan v. Louisiana, 391 U. S. 145, 149, n. 14 (1968). Thus, in holding that due process prohibits a State from taking private property without- just compensation, the Court described the right as “a principle of natural equity, recognized by all temperate and civilized governments, from a deep and universal sense of its justice.” Chicago, B. & Q. R. Co., supra, at 238. Similarly, the Court found that due process did not provide a right against compelled incrimination in part because this right “has no place in the jurisprudence of civilized and free *761 countries outside the domain of the common law.” Twining, supra, at 113.
Fourth, the Court during this era was not hesitant to hold that a right set out in the Bill of Rights failed to meet the test for inclusion within the protection of the Due Process Clause. The Court found that some such rights qualified. See, e. g., Gitlow v. New York, 268 U. S. 652, 666 (1925) (freedom of speech and press); Near v. Minnesota ex rel. Olson, 283 U. S. 697 (1931) (same); Powell, supra (assistance of counsel in capital cases); De Jonge, supra (freedom of assembly); Cantwell v. Connecticut, 310 U. S. 296 (1940) (free exercise of religion). But others did not. See, e. g., Hurtado, supra (grand jury indictment requirement); Twining, supra (privilege against self-incrimination).
Finally, even when a right set out in the Bill of Rights was held to fall within the conception of due process, the protection or remedies afforded against state infringement sometimes differed from the protection or remedies provided against abridgment by the Federal Government. To give one example, in Betts the Court held that, although the Sixth Amendment required the appointment of counsel in all federal criminal cases in which the defendant was unable to retain an attorney, the Due Process Clause required appointment of counsel in state criminal proceedings only where “want of counsel in [the] particular case . . . resulted] in a conviction lacking in . . . fundamental fairness.” 316 U. S., at 473. Similarly, in Wolf v. Colorado, 338 U. S. 25 (1949), the Court held that the “core of the Fourth Amendment” was implicit in the concept of ordered liberty and thus “enforceable against the States through the Due Process Clause” but that the exclusionary rule, which applied in federal cases, did not apply to the States. Id., at 27-28, 33.
2
An alternative theory regarding the relationship between the Bill of Rights and § 1 of the Fourteenth Amendment was *762 championed by Justice Black. This theory held that § 1 of the Fourteenth Amendment totally incorporated all of the provisions of the Bill of Rights. See, e. g., Adamson, supra, at 71-72 (Black, J., dissenting); Duncan, supra, at 166 (Black, J., concurring). As Justice Black noted, the chief congressional proponents of the Fourteenth Amendment espoused the view that the Amendment made the Bill of Rights applicable to the States and, in so doing, overruled this Court’s decision in Barron.[9] Adamson, supra, at 72 (dissenting opinion).[10] None *763 theless, the Court never has embraced Justice Black’s “total incorporation” theory.
3
While Justice Black’s theory was never adopted, the Court eventually moved in that direction by initiating what has been called a process of “selective incorporation,” i. e., the Court began to hold that the Due Process Clause fully incorporates particular rights contained in the first eight Amendments. See, e. g., Gideon v. Wainwright, 372 U. S. 335, 341 (1963); Malloy v. Hogan, 378 U. S. 1, 5-6 (1964); Pointer v. Texas, 380 U. S. 400, 403-404 (1965); Washington v. Texas, 388 U. S. 14, 18 (1967); Duncan, 391 U. S., at 147-148; Benton v. Maryland, 395 U. S. 784, 794 (1969).
*764 The decisions during this time abandoned three of the previously noted characteristics of the earlier period.[11] The Court made it clear that the governing standard is not whether any “civilized, system [can] be imagined that would not accord the particular protection.” Duncan, 391 U. S., at 149, n. 14. Instead, the Court inquired whether a particular Bill of Rights guarantee is fundamental to our scheme of ordered liberty and system of justice. Id., at 149, and n. 14; see also id., at 148 (referring to those “fundamental principles of liberty and justice which lie at the base of all our civil and political institutions” (emphasis added; internal quotation marks omitted)).
The Court also shed any reluctance to hold that rights guaranteed by the Bill of Rights met the requirements for protection under the Due Process Clause. The Court eventually incorporated almost all of the provisions of the Bill of Rights.[12] *765 Only a handful of the Bill of Rights protections remain unincorporated.[13]
Finally, the Court abandoned “the notion that the Fourteenth Amendment applies to the States only a watered-down, subjective version of the individual guarantees of the Bill of Rights,” stating that it would be “incongruous” to apply different standards “depending on whether the claim was asserted in a state or federal court.” Malloy, 378 U. S., at 10-11 (internal quotation marks omitted). Instead, the Court decisively held that incorporated Bill of Rights protections “are all to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment.” Id., at 10; see also Mapp v. Ohio, 367 U. S. 643, 655-656 (1961); Ker v. California, 374 U. S. 23, 33-34 (1963); *766 Aguilar v. Texas, 378 U. S. 108, 110 (1964); Pointer, 380 U. S., at 406; Duncan, supra, at 149, 157-158; Benton, 395 U. S., at 794-795; Wallace v. Jaffree, 472 U. S. 38, 48-49 (1985).[14]
Employing this approach, the Court overruled earlier decisions in which it had held that particular Bill of Rights guarantees or remedies did not apply to the States. See, e. g., Mapp, supra (overruling in part Wolf 338 U. S. 25); Gideon, 372 U. S. 335 (overruling Betts, 316 U. S. 455); Malloy, supra (overruling Adamson, 332 U. S. 46, and Twining, 211 U. S. 78); Benton, 395 U. S., at 794 (overruling Palko, 302 U. S. 319).
*767 III
With this framework in mind, we now turn directly to the question whether the Second Amendment right to keep and bear arms is incorporated in the concept of due process. In answering that question, as just explained, we must decide whether the right to keep and bear arms is fundamental to our scheme of ordered liberty, Duncan, 391 U. S., at 149, or as we have said in a related context, whether this right is “deeply rooted in this Nation’s history and tradition,” Washington v. Glucksberg, 521 U. S. 702, 721 (1997) (internal quotation marks omitted).
A
Our decision in Heller points unmistakably to the answer. Self-defense is a basic right, recognized by many legal systems from ancient times to the present day,[15] and in Heller, we held that individual self-defense is “the central component” of the Second Amendment right. 554 U. S., at 599; see also id., at 628 (stating that the “inherent right of self-defense has been central to the Second Amendment right”). Explaining that “the need for defense of self, family, and property is most acute” in the home, ibid., we found that this right applies to handguns because they are “the most preferred firearm in the nation to ‘keep’ and use for protection of one’s home and family,” id., at 628-629 (some internal quotation marks omitted); see also id., at 628 (noting that handguns are “overwhelmingly chosen by American society for [the] lawful purpose” of self-defense); id., at 629 (“[T]he American people have considered the handgun to be the quintessential self-defense weapon”). Thus, we concluded, *768 citizens must be permitted “to use [handguns] for the core lawful purpose of self-defense.” Id., at 630.
Heller makes it clear that this right is “deeply rooted in this Nation’s history and tradition.” Glucksberg, supra, at 721 (internal quotation marks omitted). Heller explored the right’s origins, noting that the 1689 English Bill of Rights explicitly protected a right to keep arms for self-defense, 554 U. S., at 592-593, and that by 1765, Blackstone was able to assert that the right to keep and bear arms was “one of the fundamental rights of Englishmen,” id., at 594.
Blackstone’s assessment was shared by the American colonists. As we noted in Heller, King George Ill’s attempt to disarm the colonists in the 1760’s and 1770’s “provoked polemical reactions by Americans invoking their rights as Englishmen to keep arms.”[16] Ibid.; see also L. Levy, Origins of the Bill of Rights 137-143 (1999) (hereinafter Levy).
The right to keep and bear arms was considered no less fundamental by those who drafted and ratified the Bill of Rights. “During the 1788 ratification debates, the fear that the federal government would disarm the people in order to impose rule through a standing army or select militia was pervasive in Antifederalist rhetoric.” Heller, supra, at 598 (citing Letters from The Federal Farmer III (Oct. 10, 1787), in 2 The Complete Anti-Federalist 234, 242 (H. Storing ed. 1981)); see also Federal Farmer: An Additional Number of Letters to the Republican, Letter XVIII (Jan. 25, 1788), in 17 Documentary History of the Ratification of the Constitution 360, 362-363 (J. Kaminski & G. Saladino eds. 1995); S. Halbrook, The Founders’ Second Amendment 171-278 *769 (2008). Federalists responded, not by arguing that the right was insufficiently important to warrant protection but by contending that the right was adequately protected by the Constitution’s assignment of only limited powers to the Federal Government. Heller, supra, at 599; cf. The Federalist No. 46, p. 296 (C. Rossiter ed. 1961) (J. Madison). Thus, Antifederalists and Federalists alike agreed that the right to bear arms was fundamental to the newly formed system of government. See Levy 143-149; J. Malcolm, To Keep and Bear Arms: The Origins of an Anglo-American Right 155— 164 (1994). But those who were fearful that the new Federal Government would infringe traditional rights such as the right to keep and bear arms insisted on the adoption of the Bill of Rights as a condition for ratification of the Constitution. See 1 Debates in the Several State Conventions on the Adoption of the Federal Constitution 327-331 (J. Elliot 2d ed. 1854); 3 id., at 657-661; 4 id., at 242-246, 248-249; see also Levy 26-34; 1 A. Kelly, W. Harbison, & H. Belz, The American Constitution: Its Origins and Development 110, 118 (7th ed. 1991). This is surely powerful evidence that the right was regarded as fundamental in the sense relevant here.
This understanding persisted in the years immediately following the ratification of the Bill of Rights. In addition to the four States that had adopted Second Amendment analogues before ratification, nine more States adopted state constitutional provisions protecting an individual right to keep and bear arms between 1789 and 1820. Heller, supra, at 600-603. Founding-era legal commentators confirmed the importance of the right to early Americans. St. George Tucker, for example, described the right to keep and bear arms as “the true palladium of liberty” and explained that prohibitions on the right would place liberty “on the brink of destruction.” 1 Blackstone’s Commentaries, Editor’s App. 300 (S. Tucker ed. 1803); see also W. Rawle, A View of the Constitution of the United States of America 125-126 (2d ed. 1829); 3 J. Story, Commentaries on the Constitution of *770 the United States §1890, p. 746 (1833) (“The right of the citizens to keep and bear arms has justly been considered, as the palladium of the liberties of a republic; since it offers a strong moral check against the usurpation and arbitrary power of rulers; and will generally, even if these are successful in the first instance, enable the people to resist and triumph over them”).
B
1
By the 1850’s, the perceived threat that had prompted the inclusion of the Second Amendment in the Bill of Rights— the fear that the National Government would disarm the universal militia — had largely faded as a popular concern, but the right to keep and bear arms was highly valued for purposes of self-defense. See M. Doubler, Civilian in Peace, Soldier in War 87-90 (2003); Amar, Bill of Rights 258-259. Abolitionist authors wrote in support of the right. See L. Spooner, The Unconstitutionality of Slavery 66 (1860); J. Tiffany, A Treatise on the Unconstitutionality of American Slavery 117-118 (1849). And when attempts were made to disarm “Free-Soilers” in “Bloody Kansas,” Senator Charles Sumner, who later played a leading role in the adoption of the Fourteenth Amendment, proclaimed that “[n]ever was [the rifle] more needed in just self-defense than now in Kansas.” The Crime Against Kansas: The Apologies for the Crime: The True Remedy, Speech of Hon. Charles Sumner in the Senate of the United States 64-65 (1856). Indeed, the 1856 Republican Party Platform protested that in Kansas the constitutional rights of the people had been “fraudulently and violently taken from them” and the “right of the people to keep and bear arms” had been “infringed.” National Party Platforms 1840-1972, p. 27 (D. Johnson & K. Porter comp. 5th ed. 1973).[17]
*771 After the Civil War, many of the over 180,000 African-Americans who served in the Union Army returned to the States of the old Confederacy, where systematic efforts were made to disarm them and other blacks. See Heller, 554 U. S., at 614; E. Foner, Reconstruction: America’s Unfinished Revolution 1863-1877, p. 8 (1988) (hereinafter Foner). The laws of some States formally prohibited African-Americans from possessing firearms. For example, a Mississippi law provided that “no freedman, free negro or mulatto, not in the military service of the United States government, and not licensed so to do by the board of police of his or her county, shall keep or carry fire-arms of any kind, or any ammunition, dirk or bowie knife.” Certain Offenses of Freedmen, 1865 Miss. Laws p. 165, § 1, in 1 Documentary History of Reconstruction 289 (W. Fleming ed. 1950); see also Regulations for Freedmen in Louisiana, in id., at 279-280; H. R. Exec. Doc. No. 70, 39th Cong., 1st Sess., 233, 236 (1866) (describing a Kentucky law); E. McPherson, The Political History of the United States of America During the Period of Reconstruction 40 (1871) (describing a Florida law); id., at 33 (describing an Alabama law).[18]
*772 Throughout the South, armed parties, often consisting of ex-Confederate soldiers serving in the state militias, forcibly took firearms from newly freed slaves. In the first session of the 39th Congress, Senator Henry Wilson told his colleagues: “In Mississippi rebel State forces, men who were in the rebel armies,.are traversing the State, visiting the freedmen, disarming them, perpetrating murders and outrages upon them; and the same things are done in other sections of the country.” 39th Cong. Globe 40 (1865). The Report of the Joint Committee on Reconstruction — which was widely reprinted in the press and distributed by Members of the 39th Congress to their constituents shortly after Congress approved the Fourteenth Amendment[19] — contained numerous examples of such abuses. See, e.g., H. R. Rep. No. 30, 39th Cong., 1st Sess., pt. 2, pp. 219, 229, 272, pt. 3, pp. 46, 140, pt. 4, pp. 49-50 (1866); see also S. Exec. Doc. No. 2, 39th Cong., 1st Sess., 23-24, 26, 36 (1865). In one town, the “marshal [took] all arms from returned colored soldiers, and [was] very prompt in shooting the blacks whenever an opportunity occur[red].” H. R. Exec. Doc. No. 70, at 238 (internal quotation marks omitted). As Senator Wilson put it during the debate on a failed proposal to disband Southern militias: “There is one unbroken chain of testimony from all people that are loyal to this country, that the greatest outrages are perpetrated by armed men who go up and down the country searching houses, disarming people, committing outrages of every kind and description.” 39th Cong. Globe 915 (1866).[20]
*773 Union Army commanders took steps to secure the right of all citizens to keep and bear arms,[21] but the 39th Congress concluded that legislative action was necessary. Its efforts to safeguard the right to keep and bear arms demonstrate that the right was still recognized to be fundamental. .
The most explicit evidence of Congress’ aim appears in § 14 of the Freedmen’s Bureau Act of 1866, which provided that “the right ... to have full and equal benefit of all laws and proceedings concerning personal liberty, personal security, and the acquisition, enjoyment, and disposition of estate, real and personal, including the constitutional right to bear arms, shall be secured to and enjoyed by all the citizens . . . without respect to race or color, or previous condition of slavery.” 14 Stat. 176-177 (emphasis added).[22] Section 14 thus explicitly guaranteed that “all the citizens,” black and white, would have “the constitutional right to bear arms.”
*774 The Civil Rights Act of 1866,14 Stat. 27, which was considered at the same time as the Freedmen’s Bureau Act, similarly sought to protect the right of all citizens to keep and bear arms.[23] Section 1 of the Civil Rights Act guaranteed the “full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens.” . Ibid. This language was virtually identical to language in § 14 of the Freedmen’s Bureau Act, 14 Stat. 176 (“the right... to have full and equal benefit of all laws and proceedings concerning personal liberty, personal security, and the acquisition, enjoyment, and disposition of estate, real and personal”). And as noted, the latter provision went on to explain that one of the “laws and proceedings concerning personal liberty, personal security, and the acquisition, enjoyment, and disposition of estate, real and personal” was “the constitutional right to bear arms.” Ibid. Representative Bingham believed that the Civil Rights Act protected the same rights as enumerated in the Freedmen’s Bureau bill, which of course explicitly mentioned the right to keep *775 and bear arms. 39th Cong. Globe 1292. The unavoidable conclusion is that the Civil Rights Act, like the Freedmen’s Bureau Act, aimed to protect “the constitutional right to bear arms” and not simply to prohibit discrimination. See also Amar, Bill of Rights 264-265 (noting that one of the “core purposes of the Civil Rights Act of 1866 and of the Fourteenth Amendment was to redress the grievances” of freedmen who had been stripped of their arms and to “affirm the full and equal right of every citizen to self-defense”).
Congress, however, ultimately deemed these legislative remedies insufficient. Southern resistance, Presidential vetoes, and this Court’s pre-Civil-War precedent persuaded Congress that a constitutional amendment was necessary to provide full protection for the rights of blacks.[24] Today, it is generally accepted that the Fourteenth Amendment was understood to provide a constitutional basis for protecting the rights set out in the Civil Rights Act of 1866. See General Building Contractors Assn., Inc. v. Pennsylvania, 458 U. S. 375, 389 (1982); see also Amar, Bill of Rights 187; Calabresi & Fine, Two Cheers for Professor Balkin’s Originalism, 103 Nw. U. L. Rev. 663, 669-670 (2009).
In debating the Fourteenth Amendment, the 39th Congress referred to the right to keep and bear arms as a fundamental right deserving of protection. Senator Samuel Pomeroy described three “indispensable” “safeguards of liberty under our form of Government.” 39th Cong. Globe 1182. One of these, he said, was the right to keep and bear arms:
“Every man . . . should have the right to bear arms for the defense of himself and family and his homestead. And if the cabin door of the freedman is broken open *776 and the intruder enters for purposes as vile as were known to slavery, then should a well-loaded musket be in the hand of the occupant to send the polluted wretch to another world, where his wretchedness will forever remain complete.” Ibid.
Even those who thought the Fourteenth Amendment unnecessary believed that blacks, as citizens, “have equal right to protection, and to keep and bear arms for self-defense.” Id., at 1073 (Sen. James Nye); see also Foner 258-259.[25]
Evidence from the period immediately following the ratification of the Fourteenth Amendment only confirms that the right to keep and bear arms was considered fundamental. In an 1868 speech addressing the disarmament of freedmen, Representative Stevens emphasized the necessity of the right: “Disarm a community and you rob them of the means of defending life. Take away their weapons of defense and you take away the inalienable right of defending liberty.” “The fourteenth amendment, now so happily adopted, settles the whole question.” Cong. Globe, 40th Cong., 2d Sess., 1967. And in debating the Civil Rights Act of 1871, Congress routinely referred to the right to keep and bear arms and decried the continued disarmament of blacks in the South. See Halbrook, Freedmen 120-131. Finally, legal commentators from the period emphasized the fundamental nature of the right. See, e. g., T. Farrar, Manual of the Constitution of the United States of America § 118, p. 145 (1867); *777 J. Pomeroy, An Introduction to the Constitutional Law of the United States §239, pp. 152-153 (3d ed. 1875).
The right to keep and bear arms was also widely protected by state constitutions at the time when the Fourteenth Amendment was ratified. In 1868,22 of the 37 States in the Union had state constitutional provisions explicitly protecting the right to keep and bear arms. See Calabresi & Agudo, Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in American History and Tradition? 87 Texas L. Rev. 7, 50 (2008)[26] Quite a few of these state constitutional guarantees, moreover, explicitly protected the right to keep and bear arms as an individual right to self-defense. See Ala. Const., Art. I, §28 (1868); Conn. Const., Art. I, §17 (1818); Ky. Const., Art. XIII, §25 (1850); Mich. Const., Art. XVIII, § 7 (1850); Miss. Const., Art. I, § 15 (1868) ; Mo. Const., Art. I, § 8 (1865); Tex. Const., Art. I, § 13 (1869) ; see also Mont. Const., Art. Ill, §13 (1889); Wash. Const., Art. I, § 24 (1889); Wyo. Const., Art. I, § 24 (1889); see also State v. McAdams, 714 P. 2d 1236, 1238 (Wyo. 1986). What is more, state constitutions adopted during the Reconstruction era by former Confederate States included a right to keep and bear arms. See, e. g., Ark. Const., Art. I, § 5 (1868); Miss. Const., Art. I, § 15 (1868); Tex. Const., Art. I, § 13 (1869). A clear majority of the States in 1868, therefore, recognized the right to keep and bear arms as being among the foundational rights necessary to our system of government.[27]
*778 In sum, it is clear that the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty.
2
Despite all this evidence, municipal respondents contend that Congress, in the years immediately following the Civil War, merely sought to outlaw “discriminatory measures taken against freedmen, which it addressed by adopting a non-discrimination principle” and that even an outright ban on the possession of firearms was regarded as acceptable, “so long as it was not done in a discriminatory manner.” Brief for Municipal Respondents 7. They argue that Members of Congress overwhelmingly viewed §1 of the Fourteenth Amendment “as an antidiscrimination rule,” and they cite statements to the effect that the section would outlaw discriminatory measures. Id., at 64. This argument is implausible.
First, while §1 of the Fourteenth Amendment contains “an antidiscrimination rule,” namely, the Equal Protection Clause, municipal respondents can hardly mean that § 1 does no more than prohibit discrimination. If that were so, then the First Amendment, as applied to the States, would not prohibit nondiscriminatory abridgments of the rights to freedom of speech or freedom of religion; the Fourth Amendment, as applied to the States, would not prohibit all unreasonable searches and seizures but only discriminatory searches and seizures — and so on. We assume that this is not municipal respondents’ view, so what they must mean is that the Second Amendment should be singled out for *779 special — and specially unfavorable — treatment. We reject that suggestion.
Second, municipal respondents’ argument ignores the clear terms of the Freedmen’s Bureau Act of 1866, which acknowledged the existence of the right to bear arms. If that law had used language such as “the equal benefit of laws concerning the bearing of arms,” it would be possible to interpret it as simply a prohibition of racial discrimination. But § 14 speaks of and protects “the constitutional right to bear arms,” an unmistakable reference to the right protected by the Second Amendment. And it protects the “full and equal benefit” of this right in the States. 14 Stat. 176-177. It would have been nonsensical for Congress to guarantee the full and equal benefit of a constitutional right that does not exist.
Third, if the 39th Congress had outlawed only those laws that discriminate on the basis of race or previous condition of servitude, African-Americans in the South would likely have remained vulnerable to attack by many of their worst abusers: the state militia and state peace officers. In the years immediately following the Civil War, a law banning the possession of guns by all private citizens would have been nondiscriminatory only in the formal sense. Any such law— like the Chicago and Oak Park ordinances challenged here— presumably would have permitted the possession of guns by those acting under the authority of the State and would thus have left firearms in the hands of the militia and local peace officers. And as the Report of the Joint Committee on Reconstruction revealed, see supra, at 772, those groups were widely involved in harassing blacks in the South.
Fourth, municipal respondents’ purely antidiscrimination theory of the Fourteenth Amendment disregards the plight of whites in the South who opposed the Black Codes. If the 39th Congress and the ratifying public had simply prohibited racial discrimination with respect to the bearing of arms, opponents of the Black Codes would have been left without *780 the means of self-defense — as had abolitionists in Kansas in the 1850’s.
Fifth, the 39th Congress’ response to proposals to disband and disarm the Southern militias is instructive. Despite recognizing and deploring the abuses of these militias, the 39th Congress balked at a proposal to disarm them. See 39th Cong. Globe 914; Halbrook, Freedmen 20-21. Disarmament, it was argued, would violate the members’ right to bear arms, and it was ultimately decided to disband the militias but not to disarm their members. See Act of Mar. 2, 1867, §6, 14 Stat. 487; Halbrook, Freedmen 68-69; Cramer 858-861. It cannot be doubted that the right to bear arms was regarded as a substantive guarantee, not a prohibition that could be ignored so long as the States legislated in an evenhanded manner.
IV
Municipal respondents’ remaining arguments are at war with our central holding in Heller: that the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home. Municipal respondents, in effect, ask us to treat the right recognized in Heller as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees that we have held to be incorporated into the Due Process Clause.
Municipal respondents’ main argument is nothing less than a plea to disregard 50 years of incorporation precedent and return (presumably for this case only) to a bygone era. Municipal respondents submit that the Due Process Clause protects only those rights “‘recognized by all temperate and civilized governments, from a deep and universal sense of [their] justice.’ ” Brief for Municipal Respondents 9 (quoting Chicago, B. & Q. R. Co., 166 U. S., at 238). According to municipal respondents, if it is possible to imagine any civilized legal system that does not recognize a particular right, then the Due Process Clause does not make that right bind *781 ing on the States. Brief for Municipal Respondents 9. Therefore, municipal respondents continue, because such countries as England, Canada, Australia, Japan, Denmark, Finland, Luxembourg, and New Zealand either ban or severely limit handgun ownership, it must follow that no right to possess such weapons is protected by the Fourteenth Amendment. Id., at 21-23.
This line of argument is, of course, inconsistent with the long-established standard we apply in incorporation cases. See Duncan, 391 U. S., at 149, and n. 14. And the present-day implications of municipal respondents’ argument are stunning. For example, many of the rights that our Bill of Rights provides for persons accused of criminal offenses are virtually unique to this country.[28] If our understanding of the right to a jury trial, the right against self-incrimination, *782 and the right to counsel were necessary attributes of any civilized country, it would follow that the United States is the only civilized Nation in the world.
Municipal respondents attempt to salvage their position by suggesting that their argument applies only to substantive as opposed to procedural rights. Brief for Municipal Respondents 10, n. 3. But even in this trimmed form, municipal respondents’ argument flies in the face of more than a half century of precedent. For example, in Everson v. Board of Ed. of Ewing, 330 U. S. 1, 8 (1947), the Court held that the Fourteenth Amendment incorporates the Establishment Clause of the First Amendment. Yet several of the countries that municipal respondents recognize as civilized have established state churches.[29] If we were to adopt municipal respondents’ theory, all of this Court’s Establishment Clause precedents involving actions taken by state and local governments would go by the boards.
Municipal respondents maintain that the Second Amendment differs from all of the other provisions of the Bill of Rights because it concerns the right to possess a deadly implement and thus has implications for public safety. Brief for Municipal Respondents 11. And they note that there is intense disagreement on the question whether the private *783 possession of guns in the home increases or decreases gun deaths and injuries. Id., at 11, 13-17.
The right to keep and bear arms, however, is not the only constitutional right that has controversial public safety implications. All of the constitutional provisions that impose restrictions on law enforcement and on the prosecution of crimes fall into the same category. See, e. g., Hudson v. Michigan, 547 U. S. 586, 591 (2006) (“The exclusionary rule generates ‘substantial social costs/ United States v. Leon, 468 U. S. 897, 907 (1984), which sometimes include setting the guilty free and the dangerous at large”); Barker v. Wingo, 407 U. S. 514, 522 (1972) (reflecting on the serious consequences of dismissal for a speedy trial violation, which means “a defendant who may be guilty of a serious crime will go free”); Miranda v. Arizona, 384 U. S. 436, 517 (1966) (Harlan, J., dissenting); id., at 542 (White, J., dissenting) (objecting that the Court’s rule “[i]n some unknown number of cases . . . will return a killer, a rapist or other criminal to the streets ... to repeat his crime”); Mapp, 367 U. S., at 659. Municipal respondents cite no case in which we have refrained from holding that a provision of the Bill of Rights is binding on the States on the ground that the right at issue has disputed public safety implications.
We likewise reject municipal respondents’ argument that we should depart from our established incorporation methodology on the ground that making the Second Amendment binding on the States and their subdivisions is inconsistent with principles of federalism and will stifle experimentation. Municipal respondents point out — quite correctly — that conditions and problems differ from locality to locality and that citizens in different jurisdictions have divergent views on the issue of gun control. Municipal respondents therefore urge us to allow state and local governments to enact any gun control law that they deem to be reasonable, including a complete ban on the possession of handguns in the home for self-defense. Brief for Municipal Respondents 18-20, 23.
*784 There is nothing new in the argument that, in order to respect federalism and allow useful state experimentation, a federal constitutional right should not be fully binding on the States. This argument was made repeatedly and eloquently by Members of this Court who rejected the concept of incorporation and urged retention of the two-track approach to incorporation. Throughout the era of “selective incorporation,” Justice Harlan in particular, invoking the values of federalism and state experimentation, fought a determined rearguard action to preserve the two-track approach. See, e. g., Roth v. United States, 354 U. S. 476, 500-503 (1957) (Harlan, J., concurring in result in part and dissenting in part); Mapp, supra, at 678-680 (Harlan, J., dissenting); Gideon, 372 U. S., at 352 (Harlan, J., concurring); Malloy, 378 U. S., at 14-33 (Harlan, J., dissenting); Pointer, 380 U. S., at 408-409 (Harlan, J., concurring in result); Washington, 388 U. S., at 23-24 (Harlan, J., concurring in result); Duncan, 391 U. S., at 171-193 (Harlan, J., dissenting); Benton, 395 U. S., at 808-809 (Harlan, J., dissenting); Williams v. Florida, 399 U. S. 78, 117 (1970) (Harlan, J., dissenting in part and concurring in result in part).
Time and again, however, those pleas failed. Unless we turn back the clock or adopt a special incorporation test applicable only to the Second Amendment, municipal respondents’ argument must be rejected. Under our precedents, if a Bill of Rights guarantee is fundamental from an American perspective, then, unless stare decisis counsels otherwise,[30] *785 that guarantee is fully binding on the States and thus limits (but by no means eliminates) their ability to devise solutions to social problems that suit local needs and values. As noted by the 38 States that have appeared in this case as amici supporting petitioners, “[sjtate and local experimentation with reasonable firearms regulations will continue under the Second Amendment.” Brief for State of Texas et al. 23.
Municipal respondents and their amici complain that incorporation of the Second Amendment right will lead to extensive and costly litigation, but this argument applies with even greater force to constitutional rights and remedies that have already been held to be binding on the States. Consider the exclusionary rule. Although the exclusionary rule “is not an individual right,” Herring v. United States, 555 U. S. 135, 141 (2009), but a “judicially created rule,” id., at 139, this Court made the rule applicable to the States. See Mapp, supra, at 660. The exclusionary rule is said to result in “tens of thousands of contested suppression motions each year.” Stuntz, The Virtues and Vices of the Exclusionary Rule, 20 Harv. J. L. & Pub. Pol’y 443, 444 (1997).
Municipal respondents assert that, although most state constitutions protect firearms rights, state courts have held that these rights are subject to “interest-balancing” and have sustained a variety of restrictions. Brief for Municipal Respondents 23-31. In Heller, however, we expressly rejected the argument that the scope of the Second Amendment right should be determined by judicial interest balancing, 554 U. S., at 633-635, and this Court decades ago *786 abandoned “the notion that the Fourteenth Amendment applies to the States only a watered-down, subjective version of the individual guarantees of the Bill of Rights,” Malloy, supra, at 10-11 (internal quotation marks omitted).
As evidence that the Fourteenth Amendment has not historically been understood to restrict the authority of the States to regulate firearms, municipal respondents and supporting amici cite a variety of state and local firearms laws that courts have upheld. But what is most striking about their research is the paucity of precedent sustaining bans comparable to those at issue here and in Heller. Municipal respondents cite precisely one case (from the late 20th century) in which such a ban was sustained. See Brief for Municipal Respondents 26-27 (citing Kalodimos v. Morton Grove, 103 Ill. 2d 483, 470 N. E. 2d 266 (1984)); see also Reply Brief for Respondent NR A et al. 23, n. 7 (asserting that no other court has ever upheld a complete ban on the possession of handguns). It is important to keep in mind that Heller, while striking down a law that prohibited the possession of handguns in the home, recognized that the right to keep and bear arms is not “a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.” 554 U. S., at 626. We made it clear in Heller that our holding did not cast doubt on such longstanding regulatory measures as “prohibitions on the possession of firearms by felons and the mentally ill,” “laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.” Id., at 626-627. We repeat those assurances here. Despite municipal respondents’ doomsday proclamations, incorporation does not imperil every law regulating firearms.
Municipal respondents argue, finally, that the right to keep and bear arms is unique among the rights set out in the first eight Amendments “because the reason for codifying the Second Amendment (to protect the militia) differs from the *787 purpose (primarily, to use firearms to engage in self-defense) that is claimed to make the right implicit in the concept of ordered liberty.” Brief for Municipal Respondents 36-37. Municipal respondents suggest that the Second Amendment right differs from the rights heretofore incorporated because the latter were “valued for [their] own sake.” Id., at 33. But we have never previously suggested that incorporation of a right turns on whether it has intrinsic as opposed to instrumental value, and quite a few of the rights previously held to be incorporated — for example the right to counsel and the right to confront and subpoena witnesses — are clearly instrumental by any measure. Moreover, this contention repackages one of the chief arguments that we rejected in Heller, i. e., that the scope of the Second Amendment right is defined by the immediate threat that led to the inclusion of that right in the Bill of Rights. In Heller, we recognized that the codification of this right was prompted by fear that the Federal Government would disarm and thus disable the militias, but we rejected the suggestion that the right was valued only as a means of preserving the militias. 554 U. S., at 598-599. On the contrary, we stressed that the right was also valued because the possession of firearms was thought to be essential for self-defense. As we put it, self-defense was “the central component of the right itself.” Id., at 599.
V
A
We turn, finally, to the two dissenting opinions. Justice Stevens' eloquent opinion covers ground already addressed, and therefore little need be added in response. Justice Stevens would “ ‘ground the prohibitions against state action squarely on due process, without intermediate reliance on any of the first eight Amendments. ’ ” Post, at 865 (quoting Malloy, 378 U. S., at 24 (Harlan, J., dissenting)). The question presented in this case, in his view, “is whether the par *788 ticular right asserted by petitioners applies to the States because of the Fourteenth Amendment itself, standing on its own bottom.” Post, at 883. He would hold that “[t]he rights protected against state infringement by the Fourteenth Amendment’s Due Process Clause need not be identical in shape or scope to the rights protected against Federal Government infringement by the various provisions of the Bill of Rights.” Post, at 866.
As we have explained, the Court, for the past half century, has moved away from the two-track approach. If we were now to accept Justice Stevens’ theory across the board, decades of decisions would be undermined. We assume that this is not what is proposed. What is urged instead, it appears, is that this theory be revived solely for the individual right that Heller recognized, over vigorous dissents.
The relationship between the Bill of Rights’ guarantees and the States must be governed by a single, neutral principle. It is far too late to exhume what Justice Brennan, writing for the Court 46 years ago, derided as “the notion that the Fourteenth Amendment applies to the States only a watered-down, subjective version of the individual guarantees of the Bill of Rights.” Malloy, supra, at 10-11 (internal quotation marks omitted).
B
Justice Breyer’s dissent makes several points to which we briefly respond. To begin, while there is certainly room for disagreement about Heller’s analysis of the history of the right to keep and bear arms, nothing written since Heller persuades us to reopen the question there decided. New other questions of original meaning have been as thoroughly explored.
Justice Breyer’s conclusion that the Fourteenth Amendment does not incorporate the right to keep and bear arms appears to rest primarily on four factors: First, “there is no popular consensus” that the right is fundamental, post, at *789 920; second, the right does not protect minorities or persons neglected by those holding political power, post, at 921-922; third, incorporation of the Second Amendment right would “amount to a significant incursion on a traditional and important area of state concern, altering the constitutional relationship between the States and the Federal Government” and preventing local variations, ibid.; and fourth, determining the scope of the Second Amendment right in cases involving state and local laws will force judges to answer difficult empirical questions regarding matters that are outside their area of expertise, post, at 922-927. Even if we believed that these factors were relevant to the incorporation inquiry, none of these factors undermines the case for incorporation of the right to keep and bear arms for self-defense.
First, we have never held that a provision of the Bill of Rights applies to the States only if there is a “popular consensus” that the right is fundamental, and we see no basis for such a rule. But in this ease, as it turns out, there is evidence of such a consensus. An amicus brief submitted by 58 Members of the Senate and 251 Members of the House of Representatives urges us to hold that the right to keep and bear arms is fundamental. See Brief for Senator Kay Bailey Hutchison et al. 4. Another brief submitted by 38 States takes the same position. Brief for State of Texas et al. 6.
Second, petitioners and many others who live in high-crime areas dispute the proposition that the Second Amendment right does not protect minorities and those lacking political clout. The plight of Chicagoans living in high-crime areas was recently highlighted when two Illinois legislators representing Chicago districts called on the Governor to deploy the Illinois National Guard to patrol the City’s streets.[31] The legislators noted that the number of Chicago homicide victims during the current year equaled the number of *790 American soldiers killed during that same period in Afghanistan and Iraq and that 80% of the Chicago victims were black.[32] Amici supporting incorporation of the right to keep and bear arms contend that the right is especially important for women and members of other groups that may be especially vulnerable to violent crime.[33] If, as petitioners believe, their safety and the safety of other law-abiding members of the community would be enhanced by the possession of handguns in the home for self-defense, then the Second Amendment right protects the rights of minorities and other residents of high-crime areas whose needs are not being met by elected public officials.
Third, Justice Breyer is correct that incorporation of the Second Amendment right will to some extent limit the legislative freedom of the States, but this is always true when a Bill of Rights provision is incorporated. Incorporation always restricts experimentation and local variations, but that has not stopped the Court from incorporating virtually every other provision of the Bill of Rights. “[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table.” Heller, 554 U. S., at 686. This conclusion is no more remarkable with respect to the Second Amendment than it is with respect to all the other limitations on state power found in the Constitution.
Finally, Justice Breyer is incorrect that incorporation will require judges to assess the costs and benefits of fire *791 arms restrictions and thus to make difficult empirical judgments in an area in which they lack expertise. As we have noted, while his opinion in Heller recommended an interest-balancing test, the Court specifically rejected that suggestion. See supra, at 785-786. “The very enumeration of the right takes out of the hands of government — even the Third Branch of Government — the power to decide on a case-by-case basis whether the right is really worth insisting upon.” Heller, supra, at 634.
* * *
In Heller, we held that the Second Amendment protects the right to possess a handgun in the home for the purpose of self-defense. Unless considerations of stare decisis counsel otherwise, a provision of the Bill of Rights that protects a right that is fundamental from an American perspective applies equally to the Federal Government and the States. See Duncan, 391 U. S., at 149, and n. 14. We therefore hold that the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in Heller. The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings.

It is so ordered.

 See Brief for Heartland Institute as Amicus Curiae 6-7 (noting that handgun murder rate per 100,000 persons was 9.65 in 1983 and 13.88 in 2008).

 Brief for Buckeye Firearms Foundation, Inc., et al. as Amici Curiae 8-9 (“In 2002 and again in 2008, Chicago had more murders than any other city in the U. S., including the much larger Los Angeles and New York” (internal quotation marks omitted)); see also Brief for International Law Enforcement Educators and Trainers Association et al. as Amici Curiae 17-21, and App. A (providing comparisons of Chicago’s rates of assault, murder, and robbery to average crime rates in 24 other large cities).

 Brief for Women State Legislators et al. as Amici Curiae 2.

 The Illinois State Riñe Association and the Second Amendment Foundation, Inc.

 The first sentence of the Fourteenth Amendment makes “[a]ll persons born or naturalized in the United States and subject to the jurisdiction thereof . . . citizens of the United States and of the State wherein they reside.” (Emphasis added.) The Privileges and Immunities Clause of Article IV provides that “[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States.” (Emphasis added.)

 See C. Lane, The Day Freedom Died 265-266 (2008); see also Brief for NAACP Legal Defense & Education Fund, Inc., as Amicus Curiae 3, and n. 2.

 See Lane, supra, at 106.

 United States v. Cruikshank, 92 U. S. 542, 544-545 (statement of the case), 548, 553 (opinion of the Court) (1876); Lawrence, Civil Rights and Criminal Wrongs: The Mens Rea of Federal Civil Rights Crimes, 67 Tulane L. Rev. 2113, 2153 (1993).

 Senator Jacob Howard, who spoke on behalf of the Joint Committee on Reconstruction and sponsored the Amendment in the Senate, stated that the Amendment protected all of “the personal rights guarantied and secured by the first eight amendments of the Constitution.” Cong. Globe, 39th Cong., 1st Sess., 2765 (1866) (hereinafter 39th Cong. Globe). Representative John Bingham, the principal author of the text of § 1, said that the Amendment would “arm the Congress . . . with the power to enforce the -bill of rights as it stands in the Constitution today.” Id., at 1088; see also id., at 1089-1090; A. Amar, The Bill of Rights: Creation and Reconstruction 183 (1998) (hereinafter Amar, Bill of Rights). After ratification of the Amendment, Bingham maintained the view that the rights guaranteed by § 1 of the Fourteenth Amendment “are chiefly defined in the first eight amendments to the Constitution of the United States.” Cong. Globe, 42d Cong., 1st Sess., App. 84 (1871). Finally, Representative Thaddeus Stevens, the political leader of the House and acting chairman of the Joint Committee on Reconstruction, stated during the debates on the Amendment that “the Constitution limits only thé action of Congress, and is not a limitation on the States. This amendment supplies that defect, and allows Congress to correct the unjust legislation of the States.” 39th Cong. Globe 2459; see also M. Curtis, No State Shall Abridge: The Fourteenth Amendment and the Bill of Rights 112 (1986) (counting at least 30 statements during the debates in Congress interpreting § 1 to incorporate the Bill of Rights); Brief for Constitutional Law Professors as Amici Curiae 20 (collecting authorities and stating that “[n]ot a single senator or representative disputed [the incorporationist] understanding” of the Fourteenth Amendment).

 The municipal respondents and some of their amici dispute the significance of these statements. They contend that the phrase “privileges or immunities” is not naturally read to mean the rights set out in the first eight Amendments, see Brief for Historians et al. as Amici Curiae 13-16, and that “there is ‘support in the legislative history for no fewer than four *763 interpretations of the . . . Privileges or Immunities Clause,”’ Brief for Municipal Respondents 69 (quoting Currie, The Reconstruction Congress, 75 U. Chi. L. Rev. 383, 406 (2008); brackets omitted). They question whether there is sound evidence of “ ‘any strong public awareness of nationalizing the entire Bill of Rights.’” Brief for Municipal Respondents 69 (quoting Wildenthal, Nationalizing the Bill of Rights: Revisiting the Original Understanding of the Fourteenth Amendment in 1866-67, 68 Ohio St. L. J. 1509, 1600 (2007)). Scholars have also disputed the total incorporation theory. See, e. g., Fairman, Does the Fourteenth Amendment Incorporate the Bill of Rights? 2 Stan. L. Rev. 5 (1949); Berger, Incorporation of the Bill of Rights in the Fourteenth Amendment: A Nine-Lived Cat, 42 Ohio St. L. J. 435 (1981).
Proponents of the view that § 1 of the Fourteenth Amendment makes .all of the provisions of the Bill of Rights applicable to the States respond that the terms privileges, immunities, and rights were used interchangeably at the time, see, e. g., Curtis, supra, at 64-65, and that the position taken by the leading congressional proponents of the Amendment was widely publicized and understood, see, e. g., Wildenthal, supra, at 1564-1565, 1590; Hardy, Original Popular Understanding of the Fourteenth Amendment as Reflected in the Print Media of 1866-1868, 30 Whittier L. Rev. 695 (2009). A number of scholars have found support for the total incorporation of the Bill of Rights. See Curtis, supra, at 57-130; Aynes, On Misreading John Bingham and the Fourteenth Amendment, 103 Yale L. J. 57, 61 (1993); see also Amar, Bill of Rights 181-230. We take no position with respect to this academic debate.

 By contrast, the Court has never retreated from the proposition that the Privileges or Immunities Clause and the Due Process Clause present different questions. And in recent eases addressing unenumerated rights, we have required that a right also be “implicit in the concept of ordered liberty.” See, e. g., Washington v. Glucksberg, 521 U. S. 702, 721 (1997) (internal quotation marks omitted).

 With respect to the First Amendment, see Everson v. Board of Ed. of Ewing, 330 U. S. 1 (1947) (Establishment Clause); Cantwell v. Connecticut, 310 U. S. 296 (1940) (Free Exercise Clause); De Jonge v. Oregon, 299 U. S. 353 (1937) (freedom of assembly); Gitlow v. New York, 268 U. S. 652 (1925) (free speech); Near v. Minnesota ex rel. Olson, 283 U. S. 697 (1931) (freedom of the press).
With respect to the Fourth Amendment, see Aguilar v. Texas, 378 U. S. 108 (1964) (warrant requirement); Mapp v. Ohio, 367 U. S. 643 (1961) (exclusionary rule); Wolf v. Colorado, 338 U. S. 25 (1949) (freedom from unreasonable searches and seizures).
With respect to the Fifth Amendment, see Benton v. Maryland, 395 U. S. 784 (1969) (Double Jeopardy Clause); Malloy v. Hogan, 378 U. S. 1 (1964) (privilege against self-incrimination); Chicago, B. & Q. R. Co. v. Chicago, 166 U. S. 226 (1897) (Just Compensation Clause).
With respect to the Sixth Amendment, see Duncan v. Louisiana, 391 U. S. 145 (1968) (trial by jury in criminal cases); Washington v. Texas, 388 U. S. 14 (1967) (compulsory process); Klopfer v. North Carolina, 386 *765 U. S. 213 (1967) (speedy trial); Pointer v. Texas, 380 U. S. 400 (1965) (right to confront adverse witness); Gideon v. Wainwright, 372 U. S. 335 (1963) (assistance of counsel); In re Oliver, 333 U. S. 257 (1948) (right to a public trial).
With respect to the Eighth Amendment, see Robinson v. California, 370 U. S. 660 (1962) (cruel and unusual punishment); Schilb v. Kuebel, 404 U. S. 357 (1971) (prohibition against excessive bail (assumed)).

 In addition to the right to keep and bear arms (and the Sixth Amendment right to a unanimous jury verdict, see n. 14, infra), the only rights not fully incorporated are (1) the Third Amendment’s protection against quartering of soldiers; (2) the Fifth Amendment’s grand jury indictment requirement; (3) the Seventh Amendment right to a jury trial in civil eases; and (4) the Eighth Amendment’s prohibition on excessive fines.
We never have decided whether the Third Amendment or the Eighth Amendment’s prohibition of excessive fines applies to the States through the Due Process Clause. See Browning-Ferris Industries of Vt., Inc. v. Kelco Disposal, Inc., 492 U. S. 257, 276, n. 22 (1989) (declining to decide whether the excessive-fines protection applies to the States); see also Engblom v. Carey, 677 F. 2d 957, 961 (CA2 1982) (holding as a matter of first impression that the “Third Amendment is incorporated into the Fourteenth Amendment for application to the states”).
Our governing decisions regarding the Grand Jury Clause of the Fifth Amendment and the Seventh Amendment’s civil jury requirement long predate the era of selective incorporation.

 There is one exception to this general rule. The Court has held that although the Sixth Amendment right to trial by jury requires a unanimous jury verdict in federal criminal trials, it does not require a unanimous jury verdict in state criminal trials. See Apodaca v. Oregon, 406 U. S. 404 (1972); see also Johnson v. Louisiana, 406 U. S. 356 (1972) (holding that the Due Process Clause does not require unanimous jury verdicts in state criminal trials). But that ruling was the result of an unusual division among the Justices, not an endorsement of the two-track approach to incorporation. In Apodaca, eight Justices agreed that the Sixth Amendment applies identically to both the Federal Government and the States. See Johnson, supra, at 395 (Brennan, J., dissenting). Nonetheless, among those eight, four Justices took the view that the Sixth Amendment does not require unanimous jury verdicts in either federal or state criminal trials, Apodaca, 406 U. S., at 406 (plurality opinion), and four other Justices took the view that the Sixth Amendment requires unanimous jury verdicts in federal and state criminal trials, id., at 414-415 (Stewart, J., dissenting); Johnson, supra, at 381-382 (Douglas, J., dissenting). Justice Powell’s concurrence in the judgment broke the tie, and he concluded that the Sixth Amendment requires juror unanimity in federal, but not state, eases. Apodaca, therefore, does not undermine the well-established rule that incorporated Bill of Rights protections apply identically to the States and the Federal Government. See Johnson, supra, at 395-396 (Brennan, J., dissenting) (“In any event, the affirmance must not obscure that the majority of the Court remains of the view that, as in the case of every specific of the Bill of Rights that extends to the States, the Sixth Amendment’s jury trial guarantee, however it is to be construed, has identical application against both State and Federal Governments” (footnote omitted)).

 Citing Jewish, Greek, and Roman law, Blaekstone wrote that if a person killed an attacker, “the slayer is in no kind of fault whatsoever, not even in the minutest degree; and is therefore to be totally acquitted and discharged, with commendation rather than blame.” 4 W. Blackstone, Commentaries on the Laws of England 182 (1769).

 For example, an article in the Boston Evening Post stated: “For it is certainly beyond human art and sophistry, to prove the British subjects, to whom the priviledge of possessing arms is expressly recognized by the Bill of Rights, and, who live in a province where the law requires them to be equip’d with arms, &c. are guilty of an illegal act, in calling upon one another to be provided with them, as the law directs.” Boston Evening Post, Feb. 6, 1769, in Boston Under Military Rule 1768-1769, p. 61 (1936) (emphasis deleted).

 Abolitionists and Republicans were not alone in believing that the right to keep and bear arms was a fundamental right. The 1864 Democratic Party Platform complained that the confiscation of firearms by *771 Union troops occupying parts of the South constituted “the interference with and denial of the right of the people to bear arms in their defense.” National Party Platforms 1840-1972, at 84.

 In South Carolina, prominent black citizens held a convention to address the State’s Black Code. They drafted a memorial to Congress, in which they included a plea for protection of their constitutional right to keep and bear arms: “ “We ask that, inasmuch as the Constitution of the United States explicitly declares that the right to keep and bear arms shall not be infringed . . . that the late efforts of the Legislature of this State to pass an act to deprive us [of] arms be forbidden, as a plain violation of the Constitution.’” S. Halbrook, Freedmen, The Fourteenth Amendment, and The Right to Bear Arms, 1866-1876, p. 9 (1998) (hereinafter Halbrook, Freedmen) (quoting 2 Proceedings of the Black State Conventions, 1840-1865, p. 302 (P. Foner & G. Walker eds. 1980)). Senator Charles Sumner relayed the memorial to the Senate and described the memorial as a request that black citizens “have the constitutional protection in keeping arms.” 39th Cong. Globe 337.

 See B. Kendrick, Journal of the Joint Committee of Fifteen on Reconstruction 265-266 (1914); Adamson v. California, 332 U. S. 46, 108-109 (1947) (appendix to dissenting opinion of Black, J.).

 Disarmament by bands of former Confederate soldiers eventually gave way to attacks by the Ku Klux Klan. In debates over the later enacted Enforcement Act of 1870, Senator John Pool observed that the Klan would “order the colored men to give up their arms; saying that everybody would be Kukluxed in whose house fore-arms were found.” Cong. Globe, 41st Cong., 2d Sess., 2719 (1870); see also H. R. Exec. Doe. No. 268, 42d Cong., 2d Sess., 2 (1872).

 For example, the occupying Union commander in South Carolina issued an order stating that “[t]he constitutional rights of all loyal and well disposed inhabitants to bear arms, will not be infringed.” General Order No. 1, Department of South Carolina, January 1, 1866, in 1 Documentary History of Reconstruction 208 (W. Fleming ed. 1950). Union officials in Georgia issued a similar order, declaring that “ ‘[a]ll men, without the distinction of color, have the right to keep arms to defend their homes, families or themselves.’” Cramer, Johnson, & Mocsary, “This Right is Not Allowed by Governments That Are Afraid of The People”: The Public Meaning of the Second Amendment When the Fourteenth Amendment Was Ratified, 17 Geo. Mason L. Rev. 828, 854 (2010) (hereinafter Cramer) (quoting Right To Bear Arms, Phila., Pa., Christian Recorder, Feb. 24, 1866, pp. 1-2). In addition, when made aware of attempts by armed parties to disarm blacks, the head of the Freedmen’s Bureau in Alabama “made public [his] determination to maintain the right of the negro to keep and to bear arms, and [his] disposition to send an armed force into any neighborhood in which that right should be systematically interfered with.” Joint Committee on Reconstruction, H. R. Rep. No. 30,39th Cong., 1st Sess., pt. 3, p. 140 (1866).

 The Freedmen’s Bureau bill was amended to include an express reference to the right to keep and bear arms, see 39th Cong. Globe 654 (Rep. Thomas Eliot), even though at least some Members believed that the unamended version alone would have protected the right, see id., at 743 (Sen. Lyman Trumbull).

 There can be no doubt that the principal proponents of the Civil Rights Act of 1866 meant to end the disarmament of African-Americans in the South. In introducing the bill, Senator Trumbull described its purpose as securing to blacks the “privileges which are essential to freemen.” Id., at 474. He then pointed to the previously described Mississippi law that “prohibit[ed] any negro or mulatto from having fire-arms” and explained that the bill would “destroy” such laws. Ibid. Similarly, Representative Sidney Clarke cited disarmament of freedmen in Alabama and Mississippi as a reason to support the Civil Rights Act and to continue to deny Alabama and Mississippi representation in Congress: “I regret, sir, that justice compels me to say, to the disgrace of the Federal Government, that the 'reconstructed’ State authorities of Mississippi were allowed to rob and disarm our veteran soldiers and arm the rebels fresh from the field of treasonable strife. Sir, the disarmed loyalists of Alabama, Mississippi, and Louisiana are powerless to-day, and oppressed by the pardoned and encouraged rebels of those States. They appeal to the American Congress for protection. In response to this appeal I shall vote for every just measure of protection, for I do not intend to be among the treacherous violators of the solemn pledge of the nation.” Id., at 1888-1839.

 For example, at least one Southern court had held the Civil Rights Act to be unconstitutional. That court did so, moreover, in the course of upholding the conviction of an African-American man for violating Mississippi’s law against firearm possession by freedmen. See Decision of Chief Justice Handy, Declaring the Civil Rights Bill Unconstitutional, N. Y. Times, Oct. 26, 1866, p. 2, col. 3.

 Other Members of the 39th Congress stressed the importance of the right to keep and bear arms in discussing other measures. In speaking generally on Reconstruction, Representative Roswell Hart listed the “ ‘right of the people to keep and bear arms’ ” as among those rights necessary to a “republican form of government.” 39th Cong. Globe 1629. Similarly, in objecting to a bill designed to disarm Southern militias, Senator Willard Saulsbury argued that such a measure would violate the Second Amendment. Id., at 914-915. Indeed, the bill “ultimately passed in a form that disbanded militias but maintained the right of individuals to their private firearms.” Cramer 858.

 More generally worded provisions in the constitutions of seven other States may also have encompassed a right to bear arms. See Calabresi & Agudo, 87 Texas L. Rev., at 52.

 These state constitutional protections often reflected a lack of law enforcement in many sections of the country. In the frontier towns that did not have an effective police force, law enforcement often could not pursue criminals beyond the town borders. See Brief for Rocky Mountain Gun Owners et al. as Amici Curiae 15. Settlers in the West and elsewhere, therefore, were left to “repe[l] force by force when the intervention of *778 society . . . [was] too late to prevent an injury.” District of Columbia v. Heller, 554 U. S. 570, 595 (2008) (internal quotation marks omitted). The settlers’ dependence on game for food and economic livelihood, moreover, undoubtedly undergirded these state constitutional guarantees. See id., at 599, 609, 615.

 For example, the United States affords criminal jury trials far more broadly than other countries. See, e. g., Van Kessel, Adversary Excesses in the American Criminal Trial, 67 Notre Dame L. Rev. 403 (1992); Leib, A Comparison of Criminal Jury Decision Rules in Democratic Countries, 5 Ohio St. J. Crina. L. 629, 630 (2008); Henderson, The Wrongs of Victim’s Rights, 37 Stan. L. Rev. 937, 1003, n. 296 (1985); see also Roper v. Simmons, 543 U. S. 551, 624 (2005) (Scalia, J., dissenting) (“In many significant respects the laws of most other countries differ from our law — including . . . such explicit provisions of our Constitution as the right to jury trial”). Similarly, our rules governing pretrial interrogation differ from those in countries sharing a similar legal heritage. See Dept. of Justice, Office of Legal Policy, Report to the Attorney General on the Law of Pretrial Interrogation: Truth in Criminal Justice Report No. 1 (Feb. 12, 1986), reprinted in 22 U. Mich. J. L. Ref. 437, 534-542 (1989) (comparing the system envisioned by Miranda v. Arizona, 384 U. S. 436 (1966), with rights afforded by England, Scotland, Canada, India, France, and Germany). And the “Court-pronounced exclusionary rule ... is distinctively American.” Roper, supra, at 624 (Scalia, J., dissenting) (citing Bivens v. Six Unknown Fed. Narcotics Agents, 403 U. S. 388, 415 (1971) (Burger, C. J., dissenting) (noting that exclusionary rule was “unique to American jurisprudence” (internal quotation marks omitted))); see also Sklansky, Anti-Inquisitorialism, 122 Harv. L. Rev. 1634, 1648-1656, 1689-1693 (2009) (discussing the differences between American and European confrontation rules).

 England and Denmark have state churches. See Torke, The English Religious Establishment, 12 J. Law & Religion 399, 417-427 (1995-1996) (describing legal status of Church of England); Constitutional Act of Denmark, pt. I, §4 (1953) (“The Evangelical Lutheran Church shall be the Established Church of Denmark”). The Evangelical Lutheran Church of Finland has attributes of a state church. See Christensen, Is the Lutheran Church Still the State Church? An Analysis of Church-State Relations in Finland, 1995 B. Y. U. L. Rev. 585, 596-600 (describing status of church under Finnish law). The Web site of the Evangelical Lutheran Church of Finland states that the church may be usefully described as both a “state church” and a “folk church.” See J. Seppo, The Current Condition of Church-State Relations in Finland (2004), online at http:// evl.fi/EYLen.nsf/Doeuments/838DDBEF4A28712AC225730F001F7C67? OpenDocument&lang=EN (all Internet materials as visited June 23, 2010, and available in Clerk of Court’s ease file).

 As noted above, see n. 13, swpra, eases that predate the era of selective incorporation held that the Grand Jury Clause of the Fifth Amendment and the Seventh Amendment’s civil jury requirement do not apply to the States. See Hurtado v. California, 110 U. S. 516 (1884) (indictment); Minneapolis & St. Louis R. Co. v. Bombolis, 241 U. S. 211 (1916) (civil jury).
As a result of Hurtado, most States do not require a grand jury indictment in all felony cases, and many have no grand juries. See Dept. of Justice, Office of Justice Programs, Bureau of Justice Statistics, D. Rottman & S. Strickland, State Court Organization 2004, pp. 213, 215-217 *785 (2006) (Table 38), online at http://bjs.ojp.usdoj.gov/eontent/pub/pdf/ sco04.pdf.
As a result of Bombolis, cases that would otherwise fall within the Seventh Amendment are now tried without a jury in state small claims courts. See, e. g., Cheung v. Eighth Judicial Dist. Court, 121 Nev. 867, 124 P. 3d 550 (2005) (no right to jury trial in small claims court under Nevada Constitution).

 See Mack & Burnette, 2 Lawmakers to Quinn: Send the Guard to Chicago, Chicago Tribune, Apr. 26, 2010, p. 6.

 Janssen & Knowles, Send in Troops? Chicago Sun-Times, Apr. 26, 2010, p. 2; see also Brief for NAACP Legal Defense & Educational Fund, Inc., as Amicus Curiae 5, n. 4 (stating that in 2008, almost three out of every four homicide victims in Chicago were African-Americans); id., at 5-6 (noting that “each year [in Chicago], many times more African Americans are murdered by assailants wielding guns than were killed during the Colfax massacre” (footnote omitted)).

 See Brief for Women State Legislators et al. 9-10, 14-15; Brief for Jews for the Preservation of Firearms Ownership 3-4; see also Brief for Pink Pistols et al. in District of Columbia v. Heller, O. T. 2007, No. 07-290, pp. 5-11.