# Illinois Official Reports

## Appellate Court

---

*People v. Campbell*, 2014 IL App (1st) 112926

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. VINCENT CAMPBELL, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-11-2926 |
| Filed | April 23, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's convictions and sentences for unlawful use of a weapon by a felon and violating the armed habitual criminal statute were upheld, where a motion to suppress defendant's confession had no possibility of succeeding because defendant requested counsel outside the context of an interrogation and had no effect, the constitutionality of the weapons statutes has consistently been upheld in similar situations, the trial court explicitly stated that the earlier sentence defendant served, which the court incorrectly said was 10 years, was not the basis for the sentences it imposed, and the one-act, one-crime doctrine was not violated where the indictment detailed the multiple acts he committed. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-CR-1657; the Hon. Evelyn B. Clay, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Michael J. Pelletier and Robert N. Markfield, both of State Appellate
Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg,
Amy M. Watroba, and Noah Montague, Assistant State's Attorneys,
of counsel), for the People.

Panel

PRESIDING JUSTICE HYMAN delivered the judgment of the court,
with opinion.
Justices Neville and Pucinski concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant Vincent Campbell asked to speak with an attorney before being transported to the police station, where he confessed without counsel present. His trial counsel filed, and later withdrew, a motion to suppress the confession. Campbell accuses his trial counsel of ineffective assistance. We reject Campbell's contention. The motion to suppress had no reasonable probability of success–it was based entirely on his testimony that he anticipatorily invoked his right to counsel, an act with no legal significance, and which does not present a legal bar to later custodial interrogations. And, his trial counsel's actions did not result in prejudice given the overwhelming evidence against him.

¶ 2    After a bench trial, the trial court found Campbell guilty of five counts of unlawful use of a weapon by a felon (UUWF) (720 ILCS 5/24-1.1(a) (West 2008)), and one count of violating section 24-1.7(a) of the Criminal Code of 1961, the armed habitual criminal (AHC) statute (720 ILCS 5/24-1.7(a) (West 2008)), after police seized guns and ammunition at Campbell's home during the execution of a search warrant.

¶ 3    In addition, Campbell argues: (i) both the UUWF and the AHC statutes violate his second amendment right to bear arms by criminalizing a felon's possession of a firearm for purposes of self-defense in his or her own home; (ii) the court relied on incorrect information in declining to sentence him to the minimum available term; and (iii) his UUWF conviction should be vacated under the one-act, one-crime principle because neither the indictment nor the record of proceedings indicates that the UUWF charge was based on an act of possession separate from the act alleged in charging him with violating the AHC statute. We reject these contentions as well.

¶ 4    Campbell relies on *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 561 U.S. 742, 130 S. Ct. 3020 (2010), cases in which the United States Supreme Court recognized an individual's second amendment right to bear arms, to argue both statutes infringe on that right either facially or as applied to him. But those very decisions recognize that the second amendment guarantees "the right of *law-abiding, responsible*

citizens to use arms in defense of hearth and home." (Emphasis added.) *Heller*, 554 U.S. at 635; see also *McDonald*, 561 U.S. at ___, 130 S. Ct. at 3047 ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill' *** . [Citation.] We repeat those assurances here." (quoting *Heller*, 554 U.S. at 626)).

¶ 5    In upholding Campbell's convictions, we find the AHC statute and the UUWF statute do not violate the second amendment's right to bear arms either facially or as applied to Campbell, a convicted felon. After *Heller*, federal circuits facing felon-in-possession statutes have all rejected blanket constitutional challenges to the laws. See *United States v. Joos*, 638 F.3d 581, 586 (8th Cir. 2011); *United States v. Barton*, 633 F.3d 168, 170-75 (3d Cir. 2011); *United States v. Williams*, 616 F.3d 685, 691-94 (7th Cir. 2010), *cert. denied*, ___ U.S. ___, 131 S. Ct. 805 (2010); *United States v. Rozier*, 598 F.3d 768, 777-71 (11th Cir. 2010), *cert. denied*, 560 U.S. 958 (2010); *United States v. Vongxay*, 594 F.3d 1111, 1114-15 (9th Cir. 2010), *cert. denied*, ___ U.S. ___, 131 S. Ct. 294 (2010); *United States v. Khami*, 362 F. App'x 501, 507 (6th Cir. 2010), *cert. denied*, 560 U.S. 934 (2010); *United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009), *cert. denied*, 559 U.S. 970 (2010); *United States v. Stuckey*, 317 F. App'x 48, 50 (2d Cir. 2009); *United States v. Anderson*, 559 F.3d 348, 352 n.6 (5th Cir. 2009), *cert. denied*, 557 U.S. 913 (2009).

¶ 6    We also affirm defendant's sentence. Campbell forfeited review of his claimed error; however, addressing the merits, we hold the trial court properly exercised its discretion in sentencing Campbell to two years above the minimum. We find no error, much less plain error, in the court's recitation of misinformation concerning defendant's longest previous sentence, where the court explicitly rejected the earlier sentence as a basis for the present sentence.

¶ 7    Finally, with regard to the one-act, one-crime doctrine, we hold the record supports Campbell's AHC conviction for possession of one firearm, as well as UUWF, based on possession of another firearm.

¶ 8                                      BACKGROUND

¶ 9    On January 5, 2009, about 7:25 p.m., Chicago police sergeant John Hroma, a member of the special weapons and tactics (SWAT) team, along with several other team members, arrived at 1822 South Avers Avenue, Chicago, to execute a search warrant.

¶ 10   SWAT team officers knocked on a side door, waited 10 seconds, entered, and passed through another door before finding the actual door into the home, which was unlocked. They entered the dining area; two officers went left into the living room, Sergeant Hroma and others went right.

¶ 11   At Campbell's bench trial, Sergeant Hroma testified that once inside the home, he saw Campbell leaving a bedroom and ordered him to the ground. He then cuffed Campbell and placed him in a chair in the dining room while the search continued. In the bedroom, Officers Hroma and Roth saw a loaded .38-caliber Taurus revolver lying on the bed and found a brown paper bag filled with 9-millimeter and .380 ammunition in the nightstand. The officers recovered a loaded .380 Brico semiautomatic handgun from the rafters of the basement and an unloaded .44-caliber Desert Eagle and small container holding a live 9-millimeter round from the top of a kitchen cabinet. Officer Diblich took photographs of the guns and ammunition and the locations where they were found.

¶ 12 Officer Mette recovered mail, both opened and unopened, in a dining room cabinet and in the bedroom, addressed to Vincent Campbell and Vincent and Caroline Campbell at 1822 South Avers. Officer Diblich photographed the mail.

¶ 13 When the search concluded, Officer O'Keefe escorted Campbell from the house to a squad car. Once inside the car, Officer O'Keefe gave Campbell the *Miranda* warnings. Campbell indicated he understood the warnings. Officer O'Keefe did not question Campbell during the ride to the station.

¶ 14 Officer Diblich testified that once Campbell arrived at the station, he asked him routine booking questions, such as his address, which Campbell gave as 1822 South Avers. Campbell was interviewed at the station around 9:55 p.m. Before the interview began, Officer Diblich gave Campbell his *Miranda* warnings in the presence of Lieutenant Loughran. Campbell said he understood his rights and proceeded to answer questions.

¶ 15 During the interview, conducted by both Diblich and Loughran, Campbell was told he was being charged with UUWF. They testified Campbell admitted he knew felons could not possess firearms, but he kept the guns to protect himself. He explained that he lived in a "bad neighborhood" and had heard that people, including a friend of his, had been duct-taped and robbed. They also testified that Campbell told them "he reached for the gun until he realized that it was the police entering his residence and then he stopped."

¶ 16 Diblich testified that he asked Campbell where he got his revolver, and Campbell replied, from a friend in 2002. Diblich then questioned Campbell about the gun recovered from in the kitchen, a "Desert Eagle," and "not a common weapon." Diblich informed Campbell he had worked on a burglary case in which a Desert Eagle had been stolen and wondered if Campbell had stolen the gun. Campbell replied that he bought, not stole, the gun. Diblich said that following this exchange, Campbell's "attitude changed towards [Officer Diblich], and he said that he knew a crack head had ratted him out and that he didn't want to talk to [the police] anymore." Diblich stopped questioning Campbell.

¶ 17 The State introduced photographs of Campbell's home, the three guns, and the bulk ammunition. The State also introduced group exhibit number 41, which contained proof of residency documents (the recovered mail). The parties stipulated to the admission of two certified copies of conviction, one for case number 95 CR 1597801, in which Campbell was convicted of UUWF, and one for case number 95 CR 2999201, in which Campbell was convicted of one count of UUWF and one count of possession of a controlled substance.

¶ 18 During cross-examination, Sergeant Hroma admitted that the home's outer door was opened with a pry bar, an inner door was opened with a ram, and a third door that led to the home's interior was unlocked. Hroma agreed that a report, which he did not write, but reviewed, stated that all "occupants" of the residence were secured. On redirect examination, Hroma testified that the report's use of the plural "occupants" was a typographical error.

¶ 19 Diblich testified during cross-examination that Campbell's statement was memorialized in an incident report prepared by Officer Goines at Diblich's direction.

¶ 20 The State rested, and defense counsel moved for a directed verdict, which the trial court denied.

¶ 21 Caroline Campbell, Campbell's wife, testified as follows.

¶ 22 She and Campbell married in 2000 and lived at 1528 South St. Louis Street, in a building owned by her grandmother, from 1999 to 2002, before moving to 1822 South Avers in 2002,

- 4 -

where they lived until 2006. In September 2006, Campbell moved back to the South St. Louis apartment and she lived at 1822 South Avers with their 21-year-old daughter. After moving, Campbell occasionally visited the South Avers address to see his daughter, but he never spent the night. She was not divorced or legally separated from Campbell.

¶ 23    When confronted with the State's exhibits showing photographs of the guns recovered from her bed, the top of her kitchen cabinet, and in her basement rafters, as well as a photograph of the ammunition found in her bedroom nightstand, she said she was unaware of them and did not own the guns and ammunition discovered in her home.

¶ 24    In January 2009, Campbell continued receiving mail addressed to him at the South Avers address, which his wife put aside and gave him when he would visit. On January 5, 2009, she had plans to celebrate their anniversary with Campbell at a restaurant. She picked him up at the St. Louis apartment at 4 p.m., took him to the Avers home, and let Campbell into the house while she went to the currency exchange. By the time she returned, a team of police officers was there and they advised her not to enter her home.

¶ 25    Campbell testified regarding the relationship with his wife and living situation, his testimony coincided with his wife's. He said he did not live at 1822 South Avers at the time of the police raid and had entered the house minutes before and was alone. He heard a loud noise outside, looked out a window, and saw many police officers on the porch. Campbell went to the back door, where he heard the officers "hollering 'Police, search warrant.' " According to Campbell, he opened the door and laid down on the floor at the officers' command. His hands were restrained with plastic and he was placed in a chair while the officers searched the home. Campbell asked the officers if he was under arrest and, when he was told he would be arrested, he asked if he could speak with an attorney.

¶ 26    At the police station, Campbell said he continued to ask why he was being arrested, and no one provided him with an answer for four hours. He also testified the officers never showed him any of the guns they found.

¶ 27    Campbell acknowledged he is a convicted felon and had heard the stipulation about his past felony convictions. But, Campbell denied speaking with the police and specifically denied telling any officer that (i) he knew he could not possess guns because he was a convicted felon, (ii) he was reaching for a gun when he heard them coming, (iii) he kept guns because he feared crime in his neighborhood, (iv) he knew someone who had been duct-taped and robbed, (v) he got a revolver in 2002, and (vi) he bought a Desert Eagle handgun. In addition, he denied that the guns and ammunition found at the South Avers residence belonged to him.

¶ 28    On cross-examination, Campbell testified that he could not recall the last time he had visited the South Avers address before January 5, 2009, but believed it may have been Christmas day. He conceded that he knew a convicted felon could not possess guns or ammunition.

¶ 29    Following Campbell's testimony, the defense rested.

¶ 30    In rebuttal, the State presented the testimony of Sergeant Sean Loughran who, with Officer Diblich, had conducted the interview of Campbell at the police station. Loughran recalled that Diblich read Campbell his *Miranda* warnings, and Campbell acknowledged he understood them before any questioning began. Loughran testified Campbell never requested an attorney, and consistent with Dublich's testimony, he said that Campbell told the officers he knew as a convicted felon he could not possess a gun. Loughran also confirmed that Campbell told the

officers that he was reaching for his gun when he heard a noise outside the Avers address, but stopped himself when he realized it was the police. Loughran testified about how Campbell explained to the officers that he kept a gun for fear that someone might break in, duct tape, and rob him because this had happened to someone he knew. Loughran recalled that Campbell "seemed offended at the premise that the [Desert Eagle] could be stolen," and informed the officers that he "bought that gun, [he] didn't steal it."

¶ 31 During cross-examination, Loughran admitted that he did not take any notes during his interview of Campbell or memorialize the interview in any other way. He said Campbell was read his *Miranda* warnings verbatim from an FOP book, but had not signed a written waiver.

¶ 32 Finding the evidence overwhelming, the trial court convicted Campbell, stating that "[t]he defendant's own statements support[ ] each and every count of this Indictment."

¶ 33 Campbell retained another attorney to represent him during the posttrial proceedings. Campbell's original counsel had filed a motion to suppress, but later abandoned it, and this formed the basis for a motion for a new trial based on his trial counsel's ineffective assistance for failing to litigate the motion to suppress his incriminating statements. Also, he contended that his original counsel should have requested a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), to challenge the truth of the informant's statements in the search warrant complaint. The court denied the motion for a new trial. The trial court held that even if the motion to suppress had been granted, the outcome would have been the same because of the "overwhelming" evidence against Campbell. As to trial counsel's alleged deficiency in failing to request a *Franks* hearing, the court ruled that a request would have been futile in the absence of a substantial showing of a falsity in the procurement of the search warrant.

¶ 34 After a sentencing hearing, the trial court imposed eight years' imprisonment for his violation of the AHC statute and four years' imprisonment, to be served concurrently, on his UUWF conviction. The trial court denied Campbell's motion to reconsider.

¶ 35                                                     ANALYSIS
¶ 36                                       Ineffective Assistance of Counsel

¶ 37 Campbell contends his trial counsel should have litigated the motion to suppress his alleged stationhouse confession in light of his unchallenged trial testimony that he invoked his right to counsel before being transported to the police station.

¶ 38 A successful claim of ineffective assistance of counsel requires a showing of both deficient representation and prejudice. *Strickland v. Washington*, 466 U.S. 668, 690 (1984); *People v. Albanese*, 104 Ill. 2d 504, 525 (1984). In asserting a claim of ineffectiveness, the defendant must overcome a strong presumption that his or her counsel's inaction resulted from sound trial strategy and not incompetence. *People v. Wiley*, 205 Ill. 2d 212, 230 (2001). Generally, the decision of whether to file a motion to suppress is a matter of trial strategy and "therefore one in which the court will not indulge a hindsight analysis to determine whether the attorney's decision was reasonably adequate under the circumstances." *People v. Morris*, 229 Ill. App. 3d 144, 157 (1992) (citing *People v. Bryant*, 128 Ill. 2d 448, 458 (1989)). Hence, to prevail Campbell must show that a reasonable probability existed that the motion would have been granted and the outcome of the trial would have been different had the evidence been suppressed. *Morris*, 229 Ill. App. 3d at 157. We decide this issue *de novo*. *People v. Chapman*, 194 Ill. 2d 186, 217 (2000).

¶ 39    The State claims the motion to suppress would not have been successful because it was premised entirely on Campbell's testimony that he invoked his right to counsel, testimony the trial court found incredible. Additionally, the State argues that Campbell's trial testimony that he invoked his *Miranda* rights had no legal significance. An anticipatory invocation of the right to counsel does not present a legal bar to a later custodial interrogation. *People v. Villalobos*, 193 Ill. 2d 229, 241-42 (2000) ("In order to invoke the *Miranda* right to counsel, an individual must be both in custody and subject to interrogation or under imminent threat of interrogation."). Lastly, the State argues that even if counsel erred in failing to litigate the motion to suppress, Campbell's guilt, regardless of his statement, was overwhelming and, therefore, Campbell has failed to show how counsel's alleged deficiency prejudiced him. See *Strickland*, 466 U.S. at 691 ("An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.").

¶ 40    Under both the United States and Illinois Constitutions, a criminal defendant has a constitutional right to counsel at all custodial interrogations. U.S. Const., amends. V, XIV; Ill. Const. 1970, art. I, § 10; *People v. Flores*, 315 Ill. App. 3d 387, 392 (2000). To invoke the *Miranda* right to counsel, a defendant must be in custody and subject to interrogation or under imminent threat of interrogation. *Villalobos*, 193 Ill. 2d at 241-42. When the defendant invokes that right, the police can no longer interrogate him or her, without the presence of counsel, unless the defendant initiates further communication, exchanges, or conversations with the police. *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981).

¶ 41    Campbell contends he was in custody when he invoked his right to counsel and during his subsequent interrogation at the police station. Campbell argues that his police interrogation triggered the rule articulated in *Edwards* and, therefore, the police interrogation, which resulted in his statement, was improper.

¶ 42    As support for his argument that he was in custody, Campbell points out that during the SWAT team raid on his home, 24 police officers entered the home, he was ordered to the ground, his hands were cuffed behind his back, and he was placed in a chair, where he remained while his home was searched. Campbell further testified that at some point, officers ordered him to undress. He claims that while at the house, someone informed him that he would be arrested, and at that point, exercised his right to counsel. "I asked them was I under arrest and told them I wanted to talk to a lawyer after he [*sic*] told me I was going to be arrested." This establishes, according to Campbell, that an imminent threat of interrogation prevailed and that he validly invoked his *Miranda* right to counsel. Following the search, an officer escorted Campbell to a waiting squad car, where Campbell received *Miranda* warnings and was taken to the police station. There he received a second set of *Miranda* warnings before two police officers interviewed him.

¶ 43    As to the "overwhelming" evidence against him, Campbell argues that the trial court cited only Campbell's own statements as linking him to the guns and ammunition. Based on the trial court's explanation, Campbell contends that a successful motion to suppress would have changed the outcome of his trial because it would have excluded the evidence the court itself considered the most damaging–Campbell's statements. Campbell argues that without his statements to the police, the remaining evidence linking him to the guns and ammunition would have been too weak to sustain his convictions. Campbell asks this court to remand the matter for a suppression hearing.

¶ 44 In *Edwards*, the United States Supreme Court held the right to counsel established in *Miranda* does not extend outside the occurrence of custodial interrogation. Without a custodial interrogation, "there would have been no infringement of the right that [the defendant] invoked and there would be no occasion to determine whether there had been a valid waiver." *Edwards*, 451 U.S. at 486.

¶ 45 In *McNeil v. Wisconsin*, 501 U.S. 171 (1991), the United States Supreme Court rejected a claim by the defendant that his request for an attorney in an earlier case should have served as a request for an attorney in a later case and, thus, barred questioning of him without the presence of an attorney. The defendant had requested and was appointed an attorney at an arraignment for one case and then waived his *Miranda* rights and gave statements in a separate case without an attorney present. *McNeil*, 501 U.S. at 180-82. In rejecting the defendant's argument that his request for an attorney in his first case also exercised his right to counsel in any other concurrent case, the Supreme Court stated "[i]f a suspect does not wish to communicate with the police except through an attorney, he can simply tell them that when they give him the *Miranda* warnings." *Id.* at 180. The Court noted that it had never held that a defendant could invoke his or her *Miranda* rights anticipatorily,

> "in a context other than 'custodial interrogation' ***. If the *Miranda* right to counsel can be invoked at a preliminary hearing, it could be argued, there is no logical reason why it could not be invoked by a letter prior to arrest, or indeed even prior to identification as a suspect. Most rights must be asserted when the government seeks to take the action they protect against." *Id.* at 182 n.3.

¶ 46 The Illinois Supreme Court likewise has stated that for purposes of *Miranda*, an exercise of the right to counsel before a custodial interrogation has no effect. In *Villalobos*, the defendant was arrested on an unrelated case, appointed counsel, and signed a form stating he would not participate "without the presence of his/her counsel, in any questioning, identification process or other procedures on any case or matter whatsoever." (Internal quotation marks omitted.) *People v. Villalobos*, 193 Ill. 2d at 231. While in custody on that offense, police questioned the defendant concerning an unrelated murder, which he confessed to committing, after waiving his *Miranda* rights, and was subsequently charged with. The defendant filed a motion to suppress his statements, which was denied. *Villalobos*, 193 Ill. 2d at 231-32. In rejecting his argument, our supreme court noted that "a majority of state courts" and "an overwhelming number of federal courts" relied on *McNeil* to hold that a defendant cannot invoke his or her *Miranda* rights outside the context of a custodial interrogation. *Id.* at 235, 237.

> "It is custodial interrogation with which *Miranda* was concerned. It is the right to an attorney *during custodial interrogation* that *Miranda* and its progeny protects. That right does not exist outside the context of custodial interrogation. One cannot invoke a right that does not yet exist." (Emphasis in original.) *Id.* at 239.

¶ 47 The record supports finding that trial strategy rather than incompetence dictated trial counsel's decision not to litigate the motion to suppress. Counsel originally filed the motion to suppress and asked the court to grant a continuance so that he could talk with Campbell about it. Only thereafter did counsel abandon the motion.

¶ 48 Because the motion had hardly any reasonable probability of success, trial counsel's failure to litigate it cannot be incompetence. Even accepting as true Campbell's trial testimony that he asked the police whether he was under arrest and that he wanted to speak with an attorney after they told him he would be arrested, his statements do not render inadmissible his later

statement at the police station given after waiving his *Miranda* rights. Campbell's testimony established that he was not subject to custodial interrogation when he allegedly requested counsel. The police had entered the home to execute a search warrant and, for officer safety, Campbell was restrained during the search of the home. But, he was neither placed under arrest nor questioned at the time he allegedly asked for an attorney. No evidence disputes that questioning occurred only at the police station, and only after receiving his *Miranda* warnings and indicating he understood them. On this record we cannot say counsel acted deficiently.

¶ 49 Moreover, Campbell fails to establish the prejudice necessary to satisfy his burden under *Strickland*. The trial court, in denying his motion for a new trial, stated, "Had the trial counsel [litigated] a motion to suppress statement, and even if it had been granted, it would not have affected the outcome of that trial. The evidence was overwhelming in [defendant's] case." The evidence established that Campbell was a convicted felon; that he was alone in the house where three guns and ammunition were found; that he was seen by the police walking out of the bedroom where police found a handgun lying in plain sight on the bed and ammunition in the nightstand; and that his wife denied owning or seeing the gun or ammunition. No one else was in the home after defendant's wife left and before police saw defendant walking out of the bedroom where a gun was found in plain sight. Based on this evidence, even in the absence of defendant's confession, his guilt was established beyond a reasonable doubt and, therefore, no prejudice resulted from his trial counsel's abandonment of the motion to suppress.

¶ 50 We reject Campbell's claim of ineffective assistance of counsel.

¶ 51                                            Second Amendment

¶ 52 Do Campbell's UUWF and AHC convictions violate his right to keep and bear arms under the second amendment of the United States Constitution? In a word, no.

¶ 53 Campbell argues his confession was "an articulation of his fundamental right under the Second Amendment to possess arms in his own home for the purpose of self-defense." He contends that convicted felons who have completed their sentences "have the same right to keep arms for defensive purposes held by every other citizen," and Campbell's confession acknowledged that he kept guns in the home to protect himself because he lived in a dangerous neighborhood.

¶ 54 Campbell did not raise this issue before the trial court, but a constitutional challenge to a statute may be raised at any time and, thus, is properly considered. See *People v. Bryant*, 128 Ill. 2d 448, 454 (1989). We review the constitutionality of a statute *de novo*. *People ex rel. Birkett v. Konetski*, 233 Ill. 2d 185, 200 (2009).

¶ 55 Statutes "are presumed constitutional" and the party challenging the validity of a statute bears the burden of rebutting that presumption. *People v. Cornelius*, 213 Ill. 2d 178, 189 (2004). "Moreover, ' "it is our duty to construe acts of the legislature so as to uphold their constitutionality and validity if it can reasonably be done, and, further, that if their construction is doubtful, the doubt will be resolved in favor of the validity of the law attacked." [Citations.]' " *Davis v. Brown*, 221 Ill. 2d 435, 442 (2006) (quoting *People v. Inghram*, 118 Ill. 2d 140, 146 (1987), quoting *McKenzie v. Johnson*, 98 Ill. 2d 87, 103 (1983)).

¶ 56 Campbell contends the statutes are unconstitutional on their face because they impermissibly infringe on his second amendment rights by criminalizing the possession of a firearm in one's own home kept for purposes of self-defense. A facial challenge to a statute

must show the statute is incapable of constitutional application in any context. *In re C.E.*, 161 Ill. 2d 200, 210-11 (1994). And facial challenges pose great difficulty–the defendant must show that under no set of circumstances would the statute be valid. *In re C.E.*, 161 Ill. 2d at 210-11.

> " 'The fact that the [statute] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since we have not recognized an "overbreadth" doctrine outside the limited context of the First Amendment. [Citation.]' " *In re C.E.*, 161 Ill. 2d at 211 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

¶ 57    Campbell also contends the statutes are unconstitutional as applied to him. An as-applied challenge stems from the defendant's contention that the statute as it was applied to the defendant's particular situation is unconstitutional. *Napleton v. Village of Hinsdale*, 229 Ill. 2d 296, 306 (2008). Facts surrounding the defendant's particular circumstances are only relevant to an as-applied challenge. *Russell v. Blagojevich*, 367 Ill. App. 3d 530, 534 (2006).

¶ 58    The State responds that Campbell's constitutional challenges are meritless and Campbell, as a convicted felon, relinquished his right to possess a firearm or firearm ammunition in his home and, therefore, waived his second amendment claims. The State further argues that because each statute bars possession of firearms by convicted felons, a prohibition this court has previously ruled on favorably, neither statute implicates nor offends the second amendment. We agree.

¶ 59    *Heller* and *McDonald* explicitly state that regulation of the use and possession of firearms is not categorically prohibited and, specifically, that laws may prohibit felons from possessing firearms. See *Heller*, 554 U.S. at 626-27; *McDonald*, 561 U.S. at ___, 130 S. Ct. at 3047. In *People v. Garvin*, 2013 IL App (1st) 113095, this court held the UUWF statute does not violate the second amendment where ammunition alone was found in the defendant's home. In *People v. Black*, 2012 IL App (1st) 110055, we found the AHC statute does not violate the second amendment where the defendant possessed a gun in his home. We find no reason to depart from these holdings.

¶ 60    No appellate court in any jurisdiction has ruled unconstitutional a statute prohibiting a felon from possessing a firearm or firearm ammunition in his or her home. Accordingly, we hold felon-based firearm bans, like the UUWF and AHC statutes, do not impose a burden on conduct falling within the scope of the second amendment. We reject Campbell's constitutional challenge and affirm his convictions under the UUWF and AHC statutes.

¶ 61                                    Sentencing

¶ 62    Campbell next seeks a new sentencing hearing because the sentencing court, in fashioning his sentence, relied on misinformation thereby depriving him of his right to a fair sentencing hearing. The trial court relied on erroneous information that he previously had been sentenced to 10 years in prison.

¶ 63    At the sentencing hearing, defense counsel presented two witnesses and several letters in mitigation to support his argument that Campbell should receive the minimum sentence. The trial court sentenced Campbell to eight years on his AHC conviction, two years above the minimum sentence, as well as a concurrent four-year sentence for his UUWF conviction. The

- 10 -

court recognized Campbell's mitigation evidence, "you are on your way to regretting [*sic*] and rehabilitating yourself from criminal activities." Yet, declined to impose the minimum sentence, stating:

> "I think the minimum that you had, that ten years, previous 10 year sentence, I think the minimum–to impose the minimum would deprecate the seriousness of this offense. I will not, however, match that sentence which was imposed back in 1983 and I will not impose the minimum."

¶ 64   The trial court relied on inaccurate information in stating that Campbell previously had been sentenced to 10 years. The sentence the court references for his prior offenses, 1983 armed robbery and home invasion convictions, was a concurrent term of 8 years' imprisonment, rather than 10. The misinformation was the result of a scrivener's error in the criminal history reports maintained by the Chicago police and Illinois State Police. The presentence investigation report states that Campbell had been sentenced to 10 years' imprisonment for armed robbery; however, the original mittimus from March 4, 1983, shows the sentence was 8 years, not 10.

¶ 65   Campbell argues that because the sentencing court referenced the misinformation about the length of his prior sentencing in explaining how it arrived at the sentence in this case, it is likely the misinformation factored into the sentencing. Campbell argues that because we cannot determine from the record what weight the sentencing court gave the misinformation, his sentence must be vacated and the matter remanded for a new sentencing hearing.

¶ 66   As Campbell concedes, this issue has been waived. To avoid forfeiture, challenges to defects in a sentencing hearing must be included in a motion for a new sentencing hearing. *People v. Pasch*, 152 Ill. 2d 133, 216 (1992). Defendant waived this issue by failing to object at the sentencing hearing and failing to raise the issue in a motion to reconsider. See *People v. Burt*, 168 Ill. 2d 49, 69 (1995). Campbell asks we review this error because "the judge's conduct is at issue" or alternatively, under the second prong of the plain error doctrine.

¶ 67   Appellate courts generally give a trial court's sentencing determination great deference because the trial court is in a better position to determine the appropriate sentence and balance the need to protect society with the rehabilitation potential of the defendant. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). A reviewing court cannot substitute its judgment for that of the sentencing court merely because it would have weighed the factors differently. *Stacey*, 193 Ill. 2d at 209. Nevertheless, even where the sentence imposed is within the statutory range, a reviewing court will find an abuse of discretion and reduce the sentence when it is "greatly at variance with the purpose and spirit of the law." *People v. Center*, 198 Ill. App. 3d 1025, 1032 (1990). All penalties are to be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship. *People v. Moss*, 206 Ill. 2d 503, 520 (2003). The trial court's decision will not be disturbed absent an abuse of discretion. *People v. Streit*, 142 Ill. 2d 13, 19 (1991).

¶ 68   Campbell cites *People v. Holloman*, 304 Ill. App. 3d 177 (1999), a case from the Fourth District, to support his argument that the trial court's mention of his prior sentence constituted plain error. In *Holloman*, the defendant was convicted of possession with intent to deliver cannabis. *Holloman*, 304 Ill. App. 3d at 185. During sentencing, the trial judge referenced erroneous information in the presentence report, namely, that the defendant had a prior conviction for controlled substance trafficking when the prior conviction was actually for possession with intent to deliver. *Id.* The State argued on appeal that the sentencing court

would have imposed the same sentence had the presentence report been accurate because the court only referenced the conviction in the context of noting the desirability of punishing and deterring drug dealers. *Id.* The Fourth District rejected the State's argument, holding "we cannot conclude the trial court's consideration of the trafficking conviction was insignificant." *Id*. The matter was remanded for a new sentencing hearing. *Id.*

¶ 69 Relying on *Holloman*, Campbell argues that the trial court's reference to the misinformation about his prior sentence in explaining how it fashioned the sentence here likely factored into the present sentence. Campbell argues a new sentencing hearing should be ordered because we are unable to determine from the record what weight the sentencing court gave the misinformation.

¶ 70 The State counters that recitation of the mistake was not error, much less plain error. The State distinguishes *Holloman* on the basis that in *Holloman*, the trial court gave the defendant the particular sentence because his prior record showed he was a drug dealer. *Id.* The State contends that contrary to *Holloman*, the trial court's statement here, when viewed in context, establishes that the trial court chose not to base its sentence on what it had been told was Campbell's longest term of imprisonment. In sentencing Campbell, the court stated:

> "The minimum I can impose is six years on the Class X offense which is armed habitual criminal. That very title of this offense says that you made it a habit to be a criminal and that's exactly what's involved here. It is your past, your past record.
>
> The other charges, unlawful use of a weapon by a felon, those are Class 2 offenses. I think the minimum that you had, that ten years, previous ten year sentence, I think the minimum–to impose the minimum would be to deprecate the seriousness of this offense.
>
> I will not, however, match that sentence which was imposed back in 1983 and I will not impose the minimum.
>
> So your sentence, Mr. Campbell, is eight years in the Illinois Department of Corrections on the armed habitual criminal offense and that's four years Illinois Department of Corrections on the other charge, Class 2 offenses."

These comments, argues the State, had no bearing on the trial court's decision to sentence Campbell to eight years, and the trial court did nothing more than mention, and then disregard, Campbell's previous prison term in fashioning his sentence. The State specifically offers the trial court's statement "to impose the minimum would be to deprecate the seriousness of the offense."

¶ 71 The State cites to *People v. Tyus*, 2011 IL App (4th) 100168, in which the Fourth District rejected the defendant's contention that the court erred in sentencing the defendant as it did under the mistaken belief that the applicable sentencing range for his controlled substance trafficking conviction was 18 to 160 years, when it was actually 18 to 80 years. *Tyus*, 2011 IL App (4th) 100168, ¶ 84. The Fourth District declined the defendant's invitation to review his claim on the merits, finding he had forfeited the issue. In doing so, the appellate court recognized that although the sentencing judge had stated a mistaken belief that the defendant was subject to an extended term sentence, if this was error, it was not plain error because the court did not impose an extended term sentence. *Tyus*, 2011 IL App (4th) 100168, ¶ 86.

¶ 72 Campbell has forfeited review of this issue; however, even addressing the merits, we hold the trial court properly exercised its discretion in sentencing Campbell to two years above the

minimum. The trial court chose a sentence authorized by law for the offenses. The record shows the sentencing court considered both the aggravating and mitigating factors presented during the sentencing hearing, including defendant's criminal history. The sentencing court found the nature of the offense supported the sentence. We agree.

¶ 73     The trial court did not impose a 10-year sentence, which the court mistakenly believed Campbell had previously served; rather, the court imposed an 8-year sentence after stating that the minimum 6-year sentence would "deprecate the seriousness of this offense." We find no error, much less plain error, in the court's recitation of misinformation concerning defendant's longest previous sentence, where the court explicitly rejected that sentence as a basis for the sentence it imposed.

¶ 74     The sentence Campbell received is proportionate to the serious nature of the offense he committed and consistent with the purpose of the law, including the balancing of the seriousness of the offense with defendant's rehabilitative potential. We affirm defendant's sentence.

¶ 75                                  One-Act, One-Crime

¶ 76     Campbell was charged with one violation of the AHC statute (count I) and five counts of UUWF (counts II through VI). The court found Campbell guilty on all counts, but merged his five counts of UUWF into one (count II). Campbell contends his UUWF conviction must be vacated under the one-act, one-crime principles because neither the indictment nor the record of proceedings indicated that the charge was based on a separate act of possession from that alleged in charging him as an armed habitual criminal.

¶ 77     Campbell asks that we review this issue under the plain error doctrine, his trial counsel having failed to raise the alleged violation during the trial. Our supreme court has held that an alleged one-act, one-crime violation, and "the potential for a surplus conviction and sentence affects the integrity of the judicial process" and, therefore, satisfies the second prong of the plain error doctrine. *People v. Harvey*, 211 Ill. 2d 368, 389 (2004).

¶ 78     A defendant may not be convicted of more than one offense from the same physical act. *People v. Artis*, 232 Ill. 2d 156, 165 (2009). To determine whether the convictions are based on the same physical act, the court first looks to see whether the State evinced its intent to treat the conduct as separate acts in the indictment and through its presentation of the case. *People v. Crespo*, 203 Ill. 2d 335, 342-44 (2001). If more than one conviction can be supported by the defendant's conduct, "the indictment must indicate that the State intended to treat the conduct of the defendant as multiple acts in order for multiple convictions to be sustained." *Crespo*, 203 Ill. 2d at 345. The one-act, one-crime doctrine is violated when a defendant is charged "with the same conduct under different theories of criminal culpability." *Id.* at 342.

¶ 79     The trial court convicted Campbell for violations of the AHC and UUWF statutes. An individual commits the offense of being an armed habitual criminal if he or she possesses any firearm after being convicted two or more times of certain enumerated offenses. 720 ILCS 5/24-1.7 (West 2012). An individual is guilty of UUWF if he or she possesses any firearm or firearm ammunition and he or she has previously been convicted of a felony. The possession of each firearm or firearm ammunition is a single and separate violation. 720 ILCS 5/24-1.1(a), (e) (West 2012).

¶ 80        Count II specified that the weapon Campbell possessed was a .38-caliber handgun; count I did not specify any weapon. Campbell argues that a review of the State's opening and closing arguments, as well as it comments at sentencing, shows no indication that the State considered the act of possession alleged in the AHC charge (count I), as referring to any weapon other than the .38-caliber handgun referred to in count II. Because the convictions are both predicated on the same physical act, the possession of the .38-caliber handgun, with no differentiation between them in the charging instrument, Campbell maintains that the less serious conviction should be vacated under the one-act, one-crime doctrine.

¶ 81        The State contends that Campbell committed multiple acts of possession and suffered no prejudice from having two convictions based on his possession of two different guns where the multiple indictment counts described the different guns and ammunition. According to the State, the record equally supports an interpretation that the State at no time made any statement to indicate that it regarded the act of possession alleged in the AHC charge (count I), as referring to any weapon other than the .44-caliber handgun referred to in count IV because "possession of either handgun would suffice to prove defendant guilty of [an AHC violation], and there was thus no need to specify." Further, Campbell suffered no prejudice where he was convicted of two separate acts based on evidence he illegally possessed two separate firearms. Because there was no error, there can be no plain error. We agree.

¶ 82        Our supreme court explained the one-act, one-crime doctrine in *People v. King*, 66 Ill. 2d 551, 566 (1977):

> "Prejudice results to the defendant only in those instances where more than one offense is carved from the same physical act. Prejudice, with regard to multiple acts, exists only when the defendant is convicted of more than one offense, some of which are, by definition, lesser included offenses. Multiple convictions and concurrent sentences should be permitted in all other cases where a defendant has committed several acts, despite the interrelationship of those acts. 'Act,' when used in this sense, is intended to mean any overt or outward manifestation which will support a different offense. *** [W]hen more than one offense arises from a series of incidental or closely related acts and the offenses are not, by definition, lesser included offenses, convictions with concurrent sentences can be entered."

¶ 83        If there are multiple acts as defined in *King*, multiple convictions are allowed, even if there is an interrelationship between the acts. *People v. DiPace*, 354 Ill. App. 3d 104, 116 (2004). If the court determines there are multiple acts, it must decide whether any of the offenses are a lesser-included offense because if so, multiple convictions are improper. *People v. Nunez*, 236 Ill. 2d 488, 494 (2010). Campbell does not claim that his two convictions are lesser-included offenses, only that they are based on the same act.

¶ 84        Campbell committed multiple acts of possession of guns and ammunition and suffered no prejudice from having two convictions based on possessing two different guns where the multiple indictment counts detailed the various firearms and ammunition. The one-act, one-crime doctrine was not violated. We affirm defendant's two convictions.

¶ 85                                          CONCLUSION

¶ 86        Campbell was not denied effective assistance by counsel's decision not to litigate a motion to suppress his confession, where such a motion would not have been successful and no prejudice arose. We also reject Campbell's constitutional claim and affirm his convictions

under the AHC and UUWF statutes. And we uphold the sentence as a proper exercise of the trial court's discretion. Finally, no violation of the one-act, one-crime principles occurred under the facts of this case.

¶ 87          Affirmed.