CONCURRING IN MOST OF THE JUDGMENT
BATCHELDER, Circuit Judge,
concurring in most of the judgment.
I agree with the lead opinion that the district court erred in concluding that Tyler could not prevail under Greeno’s two-step test, and I also agree with many of the points made in Judge Sutton’s opinion concurring in most of the judgment, including that there is no need to apply a tiers-of-scrutiny test to this case and that there is no need to remand it for further proceedings. I write separately because the two-step Greeno test employed by the lead opinion and by the second half of Judge Moore’s dissent fails to give adequate attention to the Second Amendment’s original public meaning in defining the contours of the mental health exception. And it is that meaning — as Heller and McDonald make unmistakably clear — informed as it is by the history and tradition surrounding the right, that counts. See District of Columbia v. Heller, 554 U.S. 570, 634-35, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008); McDonald v. City of Chicago, 561 U.S. 742, 768, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) (controlling opinion).
By giving little more than a nod to the originalist inquiry, the Greeno test radically marginalizes the role played by the text, history, and tradition of the Second Amendment, and it replaces them with the thoroughly modern (and judge empowei’-ing) regime of heightened-scrutiny review. Such review, in all its manifold forms, is at bottom an exercise in weighing present costs and benefits. Considering those costs and benefits in this case is more than “an expedition we need not take,” Sutton, J., Concurring Op. 710, it is a forbidden peregrination from' the actual meaning of the Constitution into the realms of judicial pol-icymaking. The Supreme Court has at every turn rejected the use of interest bal- *703 aneing in adjudicating Second Amendment cases. Heller, 554 U.S. at 634-35, 128 S.Ct. 2783; McDonald, 561 U.S. at 790-91, 130 S.Ct. 3020 (controlling opinion). As Heller explained, “Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad.... Like the First[ Amendment], [the Second] is the very product of an interest balancing by the people.” 554 U.S. at 634-35,128 S.Ct. 2783.
True, heightened scrutiny review has become de rigueur in First Amendment jurisprudence, and Heller never said explicitly that it has no place in Second Amendment cases. But it does not follow from this that we may rely on history only when determining the outer boundary of the right,, or that we may subject that right, even down to its very core, to whatever form of heightened scrutiny we deem “appropriate.” United States v. Greeno, 679 F.3d 510, 518 (6th Cir. 2012). The whole tenor of Heller and McDonald cuts against that approach. See Heller v. District of Columbia (Heller II), 670 F.3d 1244, 1282 (D.C. Cir. 2011) (Kavanaugh, J., dissenting); Darrell A.H. Miller, Retail Rebellion and the Second Amendment, 86 Ind. L.J. 939, 967 (2011) (“[B]oth Heller and McDonald indicate strongly that standards of scrutiny are just shorthand for unguided interest balancing.”). Both cases conspicuously refrain from engaging in anything resembling heightened scrutiny review, and, unlike the Greeno test, both put the historical inquiry at the center of the analysis, not at the margin. The Gree-no test is, moreover, incompatible with McDonald’s, assurance that Second Amendment cases will not “require judges to assess the costs and benefits of firearms restrictions and thus to make difficult empirical judgments in an area in which they lack expertise.” 561 U.S. at 790-91, 130 S.Ct. 3020.
To be sure, [Heller] noted in passing that D.C.’s handgun ban would fail under any level of heightened scrutiny or review the Court applied. But that was more of a gilding-the-lily observation about the extreme nature of D.C.’s law — and appears to have been a pointed comment that the dissenters should have found D.C.’s law unconstitutional even under their own suggested balancing approach — than a statement that courts may or should apply strict or intermediate scrutiny in Second Amendment cases. We know as much because the Court expressly dismissed Justice Breyer’s [interest-balancing] approach and went on to demonstrate how courts should consider Second Amendment bans and regulations — by analysis of text, history, and tradition,
Heller II, 670 F.3d at 1282 (Kavanaugh, J., dissenting) (citations omitted).
Nothing in Hellefs discussion of “longstanding prohibitions” suggests otherwise. Quite the opposite: in refuting the charge in Justice Breyer’s dissent that these prohibitions were ipse dixit, the Court explained that “there will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us'.” Heller, 554 U.S. at 635, 128 S.Ct. 2783. There is no reason for lower court judges to pass the time by applying heightened scrutiny— or, as the dissent would have it, by dispensing with review entirely — while we wait for the Supreme Court to step in and do the historical analysis it has promised.[1] Moreover, in embracing an approach *704 largely divorced from the text, history,- and tradition of the Second Amendment, I fear that we are well on our way to doing what Heller and, more importantly, the People who ratified the Second Amendment, forbade: “deciding] on a case-by-case basis whether the light is really worth insisting upon.” Id. at 634,128 S.Ct. 2783.
Of course, “[h]istorical analysis can be difficult,” McDonald, 561 U.S. 742, 803, 130 S.Ct. 3020, 177 L.Ed.2d 894 (Scalia, J., concurring), especially when, as here, we have less historical evidence than we might wish. As one scholar has explained, “[t]he presence of ‘distracted’ persons or ‘lunatics’ in colonial America — -perhaps due to their small numbers — aroused few expressions of public concern or fear. Insanity was not perceived as a social problem requiring formal public policies.” Gerald N. Grob, The Mad Among Us: A History of the Care of America’s Mentally III 15 (1994). Thus, as the lead opinion notes, “[o]ne searches in vain through eighteenth-century records to find any laws specifically excluding the mentally ill from firearms ownership.” Carlton F.W. Larson, Four Exceptions in Search of A Theory: District of Columbia v. Heller and Judicial Ipse Dixit, 60 Hastings L.J. 1371, 1376 (2009). Moreover, as Judge Boggs noted in the panel opinion of this case, mental institutions were a novelty at the time of the Founding: the first mental hospital in the colonies did not open until 1772. Tyler v. Hillsdale Cty. Sheriff’s Dep’t, 775 F.3d 308, 321 n.10 (6th Cir. 2014) (quoting Albert Deutsch, The Mentally III in America: A History of their Care and Treatment from Colonial Times 40 (2d ed. 1940)).
But does it follow from this lack of evidence that, as Judge Boggs speculated, it “may ... be futile” to ask “whether firearm possession by persons previously committed to a mental institution fell within the historical scope of the Second Amendment”? Id. I do not think so. The lack of an exact historical antecedent is no more troubling here than it is in a First Amendment case involving internet communications, see Reno v. Am. Civil Liberties Union, 521 U.S. 844, 849, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997), or a Fourth Amendment case involving searches conducted using thermal-imaging cameras, see Kyllo v. United States, 533 U.S. 27, 31-35, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001). By examining the Founding generation’s conception of “right,” as well as the principles of Founding-era mental-health law, we can come to a quite definite conclusion in this case.
To begin with, if we are to adjudicate decisions.involving eighteenth-century codifications of rights, it makes sense that we should first give some attention to what that word was understood to mean. Providing a comprehensive definition of such a rich term would, of course, be a complicated task, one that would go far beyond the scope of this brief concurring opinion. For today, it is sufficient to note that the idea *705 of right was intimately connected with the idea of reason, a term that referred not only to the “faculty of the mind by which it distinguishes truth from falsehood [and] enables the possessor to deduce inferences from facts or from propositions,” but also to the mind’s ability to distinguish “good from evil.” 2 Noah Webster, An American Dictionary of the English Language (1828).
Thus,' the influential eighteenth-century political philosopher Burlamaqui distinguished between “right” and “power,” explaining that “power is a physical quality; it is a power of acting in the full extent of our natural strength and liberty: but the idea of right is more confined... -. [It] is a moral quality.... [T]he use of our faculties becomes a right, only so far as it is approved by reason, and is found agreeable to [it].” 1 Jean-Jacques Burlamaqui, The Principles of Natural and Politic Law 82 (Thomas Nugent, trans., Petter Korkman, ed., Liberty Fund 2006) (1747) (emphasis added). Similarly, Locke described the natural state of man, the condition in which he had all of his natural rights, as a state of perfect freedom cab-ined only by “the law of nature,” which he defined as the rule “of reason and common equity, which is that, measure God has set to the actions of men, for their mutual security.” John Locke, Two Treatises of Government, (1691), reprinted in 4 John Locke, The Works of John Locke 207, 339, 342 (12th ed. 1824) (emphasis added). This view was widely accepted by the Founding generation. For example, in his magisterial Lectures on Law, Founding Father and law professor James Wilson explained that there could be no right “to do mischief to any one” as this would “transgress ... the law of nature,” which he defined as God’s law “communicated to us by reason and conscience.” James Wilson, Lectures on Law (1804), reprinted in James Wilson, Collected Works of James Wilson 415, 498, 1055-56 (Kermit L. Hall & Mark David Hall, eds,, Liberty Fund 2007) (emphasis added).
The emphasis on reason is significant, for, according to Founding-era legal definitions, an insane person was someone who had lost his reason. See 1 William Blackstone, Commentaries *304 (“A lunatic, or non compos mentis, is one who hath had understanding, but by disease, grief, or other accident hath lost the use of his reason.”); Henry F. Buswell, The Law of Insanity in its Application to the Civil Rights and Capacities and Criminal Responsibility of the Citizen 17 '(1885) (explaining that, to be found legally insane under longstanding English and American law, a person must be found to harbor a “belief of facts which no rational person would have believed, and [must exhibit] the inability to be reasoned out of such belief’ (footnotes omitted)). An insane person was similar to a minor who had not yet attained the age of reason — both were unable, by definition, to exercise their rights because rights could, in the central case, be exercised- only by those possessing reason. Conversely, an insane person could not justly be subjected to many -of the obligations that corresponded to those rights, such as criminal liability. See Bus-well, supra, at 33, 418-19.
This understanding was well reflected in Founding-era legal doctrine. As Professor Larson .has noted, in “eighteenth-century America, justices of the peace were authorized” to order the “confine[ment] [of] individuals with dangerous mental impairments.” Larson, supra, at 1377-78 (citing Henry Care, English Liberties, or the Free-born Subject’s Inheritance 329 (6th ed. 1774)). From this it follows a fortiori that the government could also disarm such persons, since confining implies first disarming. Id.
*706 But this is not to say that mere suspicion of serious mental illness was sufficient at common law to deprive someone of his rights. With the exception of “dangerous lunatics,” who could be arrested by anybody, see Buswell, supra, at 33-34, the common law prohibited the warrantless arrest of those thought to have lost their reason, and it allowed for the deprivation of the fundamental right to liberty or the fundamental right to'control one’s property only upon a valid judgment from a civil tribunal, see id. at 26-28.
Significantly, such deprivations were not once-for-all. Since, at least the time-of Edward I (1239-1307), the English legal tradition provided that those who had recovered their sanity should have their rights restored. See 1 Frederick Pollock & Frederic William Maitland, The History of English Lem Before the Time of Edward I 507-08 (1898). As one early nineteenth-century legal treatise put it, “[a] lunatic is never to be looked upon as irrecoverable.” Anthony Highmore, A Treatise on the Law of Idiocy and Lunacy 73 (1807). And “the law always imagines, that the[ ] accidental misfortunes [i.e., the misfortunes that caused the lunacy] may be removed.” 1 Blackstone, supra, at *304-*05; see also Care, supra, at 329 (“[A lunatic] is to be kept ... locked up only so long as such lunacy or disorder shall continue, and no longer.”). This comports with the Founding-era conception of rights because that which a person recovered when he overcame a serious mental illness was his reason, the faculty necessary to exercise his rights.[2]
As I noted at the outset, it is true that § 922(g)(4) has no direct ancestors in the eighteenth century. But if the government could not, on the basis of mental illness, irrevocably deprive someone of his fundamental right to liberty (and thus of any firearms) or his fundamental right to control his property, why should it be permitted to irrevocably deprive him of the fundamental right to keep and bear arms? The answer is that it should not. Why else would Heller use the phrase “the mentally ill,” rather than “those, who once suffered from mental illness”? .
It might be argued that guns should be subject to different rules because they are so dangerous. But while the dangerousness of guns may be relevant when considering what kind of showing someone must make to get his gun rights back, that fact cannot justify treating gun rights as fundamentally different from other rights. See McDonald, 561 U.S. at 780, 130 S.Ct. 3020 (“[The right to keep and bear arms is not] a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.”) (controlling opinion). Indeed, it is not as if the restoration of the recovered person’s liberty and ability to control his property did not carry with it serious risks either. And, as Heller noted, while it is true that, in the decades before the Founding, the right to bear arms was often treated by English courts with far less respect than other fundamental rights, see 3 Joseph Story, Commentaries on the Constitution of the United States § 1891 (1833) (noting that English common-law courts had circumscribed the right to bear arms to the point where it *707 was “more nominal than real, as a' defensive privilege”), that is not how we may treat that right, see Heller, 554 U.S. at 608, 128 S.Ct. 2783; McDonald, 561 U.S. at 780, 180 S.Ct. 3020. (controlling opinion).
The key fact is that, at the time of the Founding, no fundamental right could lawfully be circumscribed to the extent that § 922(g)(4) regulates gun rights. That provision thus unconstitutionally “infringes” upon Tyler’s right to keep and bear arms. U.S. Const, amend. II. Indeed, because it gives him no means to challenge the prohibition, it does far more than “infringe” upon that right, it extirpates it.
The lead opinion largely gets the ultimate answer right. But its conclusions are far less certain than those offered by a Heller-style historical analysis. For the reasons I have laid out’ above, the Greeno framework gives me little confidence that this court will not in future cases go from taking rights seriously to seriously taking rights. As has been mentioned many times today, the dangers presented by guns are real, frightening, and obvious. Those realities will continue to factor heavily in the scrutiny analysis. Less obvious to the contemporary judicial mind are the Founding-era fears of tyranny and defenselessness that provided the impetus behind the Second Amendment. Whether the Founding generation struck a wise balance in ratifying that amendment “is perhaps debatable.” Heller, 554 U.S. at 636, 128 S.Ct. 2783. What is not debatable is that we— federal judges — are neither philosopher kings empowered to “fix” things according to the dictates of what we fancy is our superior insight, nor rubber stamps, approving whatever laws the legislatures of this country happen to pass. We are bound, rather, by our oath to uphold and defend the Constitution, and we must therefore show restraint when that document restrains us and be active when it commands action. We must, in other words, say “what the law is.” Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803). That task, difficult though it may sometimes be, is straightforward: “A law either infringes a constitutional right, or not; there is no room for the judiciary to invent tolerable degrees of encroachment.” Whole Woman’s Health v. Hellerstedt, — U.S.-, 136 S.Ct. 2292, 2329-30, 195 L.Ed.2d 665 (2016) (Thomas, J., dissenting). The Second Amendment is part of our law; it is a constitutional right possessed by citizens against their governments. Rather than continuing to subject it — as required by Greeno — to a means— ends evaluation guided by our own sense of what is important, we should take this opportunity to overrule Greeno. For, as Heller warned, “A constitutional guarantee subject to future judges’ assessments of its usefulness is no constitutional guarantee at all.” 554 U.S. at 634, 128 S.Ct. 2783.
Accordingly, I agree that this ease must be reversed, and although for the foregoing reasons I do not believe a remand is necessary, under the circumstances of this case I agree to a remand, either for entry of judgment in favor of Tyler, or to permit the district court to conduct a hearing into whether Tyler falls under Hellers category of “the mentally ill.”

. The lead opinion says that Greeno should be retained because it thinks it would be unwise to “strike out on our own analytical path and part ways with nearly all of the circuit courts *704 to analyze gun regulations.” Lead Op. 692-93 n.14. I understand the desire to keep in step with our sister circuits, of course, but I do not think that in adjudicating fundamental rights we should value uniformity over fidelity to the law, especially in an area where the law is still developing rapidly. Moreover, discarding Greeno hardly entails striking out on our own — the "analytical path” was first cut in Heller. It is the lower courts, both we and our sister circuits, that have departed from that path, engaging in "narrowing from below,” see Richard M, Re, Nanowing Supreme Court Precedent from Below, 104 Geo. L.J. 921, 962-63 (2016), by implementing the increasingly indeterminate framework of heightened scrutiny review, see Whole Woman's Health v. Hellerstedt, — U.S, -, 136 S.Ct. 2292, 2326-28; 195 L,Ed,2d 665 (2016) (Thomas, J., dissenting) (describing the breakdown of the tiers-of-scrutiny doctrines in recent Supreme Court cases).

. Not only was this the view at the time of the ■ Founding, it is also, as Judge Sutton has ably ' explained, undoubtedly correct. Indeed, I am aware of no era or culture that has not recognized that mental illness can sometimes be overcome. See, e.g., Daniel 4:28-36 ("And at the end of the days [of my madness] I Nebuchadnezzar lifted up mine eyes unto heaven, and mine understanding returned unto me, and I blessed the most High.” (emphasis added)) (King James); further see generally History of Mental Disorders, Wikipedia (April 26, 2016, 1:09 AM), https://en.wikipedia.org/wiki/ History_o£_mentaLdisorders.